STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-163

**STATE IN THE INTEREST OF**

**K. V. & K. V.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. J-2011-041
HONORABLE H. WARD FONTENOT, JUDGE PRO TEMPORE

\*\*\*\*\*\*\*\*\*\*

**PHYLLIS M. KEATY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, James T. Genovese, and Phyllis M. Keaty, Judges.

**REVERSED AND RENDERED.**

**Thomas W. Sanders, Jr.**
**Attorney at Law**
**1919 Kirkman Street**
**Lake Charles, Louisiana 70601**
**(337) 291-2067**
**Counsel for Appellant:**
     **State of Louisiana, Department of Children & Family Services**

**E. David Deshotels, Jr.**
**Attorney at Law**
**Post Office Box 399**
**Oberlin, Louisiana 70648**
**(337) 639-4309**
**Counsel for Appellee:**
     **K. V. (father)**

**Chad B. Guidry**
**Attorney at Law**
**Post Office Box 447**
**Kinder, Louisiana  70648**
**(337) 738-2280**
**Counsel for Appellee:**
      **K. S. (mother)**

**Franchesca Hamilton-Acker**
**Acadiana Legal Services Corp.**
**Post Office Box 4823**
**Lafayette, Louisiana  70502-4823**
**(337) 237-4320**
**Counsel for Appellees:**
      **K. V. (child)**
      **K. V. (child)**

**KEATY, Judge.**

Following a bench trial, the trial court rendered judgment dismissing the State of Louisiana's petition to terminate the parental rights of the mother and the father, K.R.S. and K.S.V.,[1] to their minor children, fraternal twins K.S.V. and K.N.D.V., after finding that the State had not proven its case by clear and convincing evidence. The judgment ordered the minor children to remain in the custody of the Department of Children and Family Services (DCFS) with a case plan goal of adoption. The State now appeals. For the following reasons, we reverse.

## FACTS AND PROCEDURAL HISTORY

The twins, one male and one female, born on September 20, 2010, were placed in the custody of DCFS by an Oral Instanter Order issued on June 1, 2011. The basis of the Order was neglect that presented substantial immediate danger to the health and safety of the twins. According to the affidavit filed in support of the Instanter Order, at the time of their placement with DCFS, the twins lived in a one-room trailer with their mother and five other adults, all of whom were alleged drug users. The affidavit provided that a May 13, 2011 investigation into a report of abuse/neglect revealed that the female child had a cigarette burn on her left wrist and a yeast infection on her neck caused by improper bathing and that both children had multiple insect bites. When interviewed by a DCFS employee as part of the investigation, the mother stated that she had recently moved out of the home of the twins' father's mother, Wanda Vincent, because Ms. Vincent's boyfriend sold crack cocaine and marijuana. She stated that she had to call law enforcement

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding. Because the father and the male child have the same initials, we will hereafter not refer to the parents by their initials.

to get her infant daughter back because Ms. Vincent wanted to keep the baby. The mother further expressed her belief that Ms. Vincent had filed this "bogus" report on her because Ms. Vincent was mad that she and the twins had moved out.

The affidavit in support of the Instanter Order expressed DCFS's finding that the mother was a teenager who lacked parenting skills, who had repeatedly failed to properly supervise her infant children, and who was unable to provide for her own needs and the needs of her children. The affidavit further detailed that the twins' father was incarcerated at the time of their removal from their mother's care. Originally, the twins were placed in a certified foster home in Lake Charles, Louisiana. On June 24, 2011, they were moved to another certified adoptive foster home in Sulphur, Louisiana, where they remain. According to a DCFS report dated September 27, 2011, the twins "adjusted well to their placement and are thriving."

The minors were adjudicated children in need of care on July 7, 2011, by Judge Joel Davis, and a case plan was established which sought permanency through reunification. Following a Permanency Hearing in April 2012, the case plan goal was changed to adoption, and in June 2012, DCFS filed a Petition for Certification for Adoption and Termination of Parental Rights (Petition for Adoption).

After several continuances, a hearing on the petition was conducted on October 9, 2013, before Judge Pro Tempore H. W. Fontenot, and the matter was taken under advisement. Judge Fontenot issued written reasons for judgment one week later "dismiss[ing] the petition for termination of parental rights," continuing the children in State custody, and giving the parents the opportunity to complete a new case plan that "sets realistic goals for the parents in view of their limitations."

2

The State appealed and is now before this court asserting the following assignment of error:

> Whether the decision by the Judge, *Pro Tempore*, was manifestly erroneous in its failing to terminate the parental rights of the parents where the parents failed to substantially comply with prior case plan(s) for services, which were court-approved by the Judge ordinarily assigned to the division of Court where the matter was assigned, for a period of twenty-eight (28) months – far in excess of the one (1) year contemplated, under the law – and where there is no reasonable expectation of significant improvement in the parents' conduct in the near future.

## DISCUSSION

### *Law*

"We review a trial court's determination as to whether parental rights should be terminated according to the manifest error standard of review." *State in Interest of M.A.N.*, 12-946, p. 3 (La.App. 3 Cir. 12/28/12), 106 So.3d 288, 290-91.

> Louisiana Children's Code Article 1015 sets forth eight grounds for termination of parental rights. Although the State need only establish one ground for termination, the trial court must also find that the termination is in the best interest of the child in order to meet the statutory requirement of La.Ch.Code art. 1035(A), which requires that grounds for termination be proven by clear and convincing evidence.

*State in the Int. of J.K.G.*, 11-908, pp. 5-6 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 14-15.

### *The Case Plans*

After the twins were adjudicated in need of care on July 7, 2011, the trial court set a review hearing for October 5, 2011. According to a DCFS report filed into the record on October 3, 2011, a family conference was held on June 30, 2011, between the parents and the twins' foster parents, where numerous recommendations were made regarding what was required of the parents to be reunited with the twins. More specifically, they were directed to maintain their

own safe, clean, and stable environment in which to reside on a daily basis for at least six consecutive months. The residence was to have adequate space and bedroom furniture, as well as electricity, running water, an adequate food supply, and operational kitchen and bathroom facilities. The parents were directed to obtain and maintain employment or income sufficient to provide a steady income for the family sufficient to meet its food, shelter, utility, and clothing needs. Said employment and/or income was to be maintained for at least six consecutive months, and the parents were each told to provide verification of their income and expenses to the case manager on a monthly basis. The parents agreed to complete a family assessment and to follow all of the recommendations made by the evaluator. They further agreed to submit to substance abuse assessments, to complete any recommended treatment, and to undergo random drug screens. The parents agreed to attend nurturing parenting classes and to show positive attention to the twins during family visits. The parents were told to develop three positive connections within the community to provide them with support and assistance. In addition, the parents were told to keep in contact with DCFS, to be available for monthly home visits by their case worker, and to attend all team conferences, court hearings, and visits with the twins. DCFS agreed to assist the parents with any transportation needed to comply with its recommendations. At the time the report was filed, DCFS recommended that the twins remain in foster care for six months with the goal of reunification with their parents. By Case Review Judgment dated October 12, 2011, Judge Davis approved the case plan submitted by DCFS and ordered that it be complied with by all the parties.

By the time DCFS filed its next report with the trial court on April 5, 2012, the primary goal for the twins had been changed to adoption with the secondary

goal of reunification with their parents. The record reflects that at a Permanency Hearing conducted before Judge Ad Hoc Ronald Cox on April 5, 2012, the trial court informed the parents of their "obligation to cooperate with [DCFS], comply with the requirements of the case plan, including their duty to keep the department apprised of their current address, and to correct the conditions requiring the child[ren] to be in need of care." The trial court informed the parents that "a termination of parental rights petition may be filed based on their failure to comply with the case plan, to make significant measurable progress toward achieving case plan goals and to correct the conditions requiring the children to be in care." The parents were also told that "[f]ederal law requires the state to file a petition to terminate parental rights when a child has been in custody for 15 of the most recent 22 months." The record reflects that the trial court determined that the permanent plan that was the "most appropriate and in the best interest of the child(ren), considering the child(ren)'s health and safety" was adoption with the secondary goal of reunification. Finally, the record reflects that the trial court found that DCFS had made reasonable efforts "to prevent or eliminate the need for removal of the children from their home, and after removal, to make it possible for the children to safely return home."

In June 2012, after more than one year had elapsed since the twins were placed in the State's custody, DCFS filed a Petition for Adoption (the Petition). The Petition alleged that the parents had failed to substantially comply with the court-approved case plan for a period in excess of one year, that neither parent had resolved the issues that led to the twins being taken into the State's custody, and that there was no reasonable expectation of their substantial compliance with the case plan in the future. The Petition further alleged that neither parent had

5

submitted proof of their making parental contributions[2] to the care and support of their children since the time they had been taken into the State's custody.

Judge Davis ordered the parents to answer the Petition for Adoption on July 3, 2012, and for trial of the Petition for Adoption to take place on July 25, 2012. A minute entry dated July 25, 2012, indicates that upon recommendation of the State, Judge Davis continued the matter until October 4, 2012, to allow the parents more time to complete the case plan. Another minute entry dated October 4, 2012, shows that upon motion of the State, the termination hearing was passed and reset for December 6, 2012, and that the parents were advised by Judge Fontenot to cooperate with the case plan.

DCFS sent a Court Addendum to Judge Davis on October 1, 2012, to advise the trial court that the father had not started the anger management classes required in his case plan. When the termination hearing was called on December 6, 2012, the attorney representing the twins motioned the trial court to appoint CASA to represent the twins. Judge Fontenot granted the motion and continued the termination hearing to April 4, 2013.

In the interim, clinical/medical psychologist Dr. Alfred Buxton conducted psychological examinations of the parents, the results of which were detailed in two reports filed in the trial court in December 2012. Dr. Buxton noted that the mother's "child-rearing beliefs and attitudes are similar to those found in individuals known to be abusive and neglectful as caregivers," thus raising concerns of her ability to function as the primary caregiver of the twins. He recommended that the mother seek outpatient mental health and substance abuse

---

[2]According to a December 12, 2011 Case Plan Review, the parents agreed to each pay $10 per month per child, starting on April 1, 2012, to support their children in foster care.

intervention before DCFS should consider reunification with the twins. Because he believed that the father was exhibiting a "fake good" profile, Dr. Buxton was unable to determine his child-rearing beliefs and attitudes. Nevertheless, given the father's past behavior, Dr. Buxton opined that the same behavior which brought him to the attention of DCFS would probably continue.

After conducting visits with the twins in their foster home, CASA filed a Court Report on April 2, 2013, wherein it recommended that the twins remain in State care because of the parents' failure to complete their case plan. In a report filed with the trial court on April 4, 2013, DCFS noted that, while the parents had made some progress on their case plan, their failure to make parental contributions for the support of the twins, their need for more intensive parenting instruction, their failure to attend all scheduled meetings/appointment regarding the twins, the recent denial of the mother's request for Social Security Disability benefits (SSD), the father's failure to attend anger management classes, and his failure to verify his employment since November 2011 led to its recommendation that the twins remain in State's custody with the goal of adoption. Thereafter, at a permanency and termination hearing conducted before Judge Davis on April 4, 2013, the matter was again continued without date to allow the parents even more time to work on the case plan.

### *The Termination Hearing*

The termination hearing was eventually tried on October 9, 2013, before Judge Fontenot and the following testimony and evidence was adduced. The State's first witness was the mother. She testified that she and the twins' father had been living with her mother, Ms. Julia Hall, since December 2012. According to the mother, Ms. Hall had told them that they and the twins could live with her

7

indefinitely. Nevertheless, the mother admitted that she had previously been kicked out of her mother's home. The $525 rent for the three-bedroom apartment was being paid solely by Ms. Hall, even though the twins' father was working at Burger King and as a maintenance man at the apartment complex where they lived. The mother admitted that even though their case plan required her and the twins' father to obtain and maintain adequate housing, they had not paid any rent since they had moved in with Ms. Hall, despite her belief that they could afford rent if her mother would not cover their rent. She further admitted that she and the twins' father had not paid the $20 per month, or $10 per parent, parental contributions since April 2013. The mother further acknowledged that some of the parental contributions that had been made in the past had actually been paid by family members rather than by them personally.

The mother stated that she suffered with congestive heart failure and high blood pressure which required her to take several prescription medications. She explained that she had applied for SSD, which had been denied, and that she had obtained an attorney to appeal that ruling. The mother testified that in September 2012, she was ordered to pay $100 per month in child support plus an additional $10 per child for medical expenses. She acknowledged that she was not employed and that she had not made any of those court-ordered payments, resulting in her being $1440 in arrears at the time of the termination hearing. She further explained that she believed that she did not owe child support if she was not receiving SSD.

The mother further stated that part of her case plan was to attend counseling and to follow the recommendations of the counselors. She testified that she stopped going to counseling in March 2013 because, in her words, "I don't like counselors." The case plan also required that she and the twins' father attend parenting skills

8

classes and that they have visitation with the twins in their home to be observed by visit coaches who were there to teach them how to properly care for and nurture their children. The current visitation schedule called for the twins to be in the parents' home from 8:00 a.m. to 12:00 p.m. three times per week. The mother admitted that at the time of trial, the parenting coaches had worked with her and the father for approximately sixty-eight visits.

According to the mother, neither she nor the twins' father has a valid driver's license. Nevertheless, she admitted that the father sometimes drives a truck that is owned and insured by her mother. Upon questioning by the State's attorney, the mother admitted that she had once traveled to the park in a five-seat car with five adults and three children who were not restrained in their car seats. She also admitted to having missed one week of visitation with the twins when she and their father took a trip to New York with the Make a Wish Foundation because of her heart condition. Finally, while the mother admitted to having substance abuse problems when the twins were taken into State's custody, she assured the court that those problems were now behind her.

The father was the second witness called by the State. He confirmed that he and the twins' mother lived with Ms. Hall and that his name was on the lease. According to the father, he was responsible for paying for utilities, water, and cable for the apartment, as well as for paying his cell phone bill and some of the groceries. He testified that he felt that he could pay the $525 monthly rent if Ms. Hall became unable or unwilling to do so. He confirmed that he sometimes drives a truck owned by Ms. Hall even though he does not have a valid driver's license.

The father explained that he has had a part-time job at Burger King since August 2013. He admitted that his paycheck for his first two weeks of work there

9

totaled $110. The father also stated that he had worked as a maintenance man at the apartment complex where they lived since April and that he had received two checks totaling slightly over $520 since that time. He explained that there has been a delay in his getting paid, but that the new landlord told him that he should soon receive the money that he was owed, which he estimated to be $710.

The father confirmed that he had not seen a counselor since late March 2013, despite the case plan requirement that he do so. He acknowledged that the initial case plan called for him to attend substance abuse classes, which he had done. Nevertheless, he confirmed that he tested positive for opiates and marijuana in March 2013 and that he had a presumed positive drug screen in August 2013 when he refused to undergo the test, necessitating his attendance at additional substance abuse assessments.

The father stated that the case plan required him to attend anger management classes with Eddie Windham and that he completed seven of the required sixteen classes. He explained that he stopped attending classes when he could no longer afford to pay for them, but his balance was current. He further explained that he had resumed attending the remaining classes at the time of trial. He acknowledged having previously advised the trial court that he was attending anger management classes when, in fact, he was not doing so.

The parties entered into a stipulation whereby they acknowledged that if Eddie Windham was called as a witness, he would state that the father had only attended two anger management sessions. In conjunction with the stipulation, the trial court allowed the father's attorney to introduce into evidence a receipt

10

showing that the father had paid Mr. Windham $200. According to the father's attorney, there was a $50 registration fee for the classes and each class cost $25.[3]

The third witness to testify in the State's case was Kimberly Ardoin. Ms. Ardoin stated that she was a CASA volunteer and that she had been assigned to this case since June 2013. Since that time, she estimated that she had visited the twins about eighteen to twenty times at either their foster parents' or their biological parents' homes. In her opinion, the twins' foster home was "a very good place [for them] right now." Ms. Ardoin described the twins' foster home as very supportive and child oriented and where the twins "are comfortable and looked after and nurtured and stimulated in a good way so that they can learn and also be themselves." On the other hand, Ms. Ardoin testified that when the twins are in their biological parents' home, they are fed and looked after, but there is no engagement, nurturing, or parenting in a way that she would expect for a family with two- to three-year-old twins. Ms. Ardoin stated that during the times she visited in the biological parents' home, she never saw any evidence that they had learned anything during their parent training classes, which came as a shock to her.

According to Ms. Ardoin, there were always people coming and going into the biological parents' home, and she was unable to ascertain who was living there. She also expressed concern for the twins' safety at the home because their apartment was at the top of some steep concrete stairs, and the door was always being opened with various people going in and out when the twins were visiting. In fact, Ms. Ardoin noted that, while she was there, she felt that she was watching the twins closer than their parents. She stated that there were cigarettes and

---

[3] The father's attorney calculated that the $200 represented the registration fee and seven classes. According to our calculations, $200 would only cover the registration fee and six classes.

lighters in the home and that there were many pets there. She noted that many of the parents' scheduled visits with the twins had been cancelled for what she termed "trivial reasons." She further noted that the father was absent during most of her visits to their home. Ms. Ardoin related to the trial court the details regarding an incident that occurred in July 2013 when she made an unannounced visit to the parents' home at 10:00 one morning and was told that she was not welcome there because it was "their sleeping time."

The fourth witness called by the State was Sheila Liechty, an employee of the Education Treatment Council (ETC), the resource program that offered the biological parents visit coaching and supervision during the visits between them and the twins. Ms. Liechty testified that the parents attended six weeks of family skills training beginning in July 2012 where they were taught topics to benefit their family's daily living, such as how to budget and how to plan and shop for meals. The parents next attended ETC's nurturing/parenting program beginning in August 2012, which they completed in nineteen weeks. Ms. Liechty explained that the goal of the program was to educate parents on the fundamentals of parenting. She further explained that after completing the course work, ETC performed visit coaching sessions to observe whether the parents were practicing what they had learned.

According to Ms. Liechty, the biological parents had cancelled twenty-three of the seventy-three scheduled visit coaching sessions at their home, which she found to be excessive. Ms. Liechty added that on one occasion the ETC employee was not told of the cancellation until after the employee had picked up the twins from daycare and that both the employee and the twins had become distraught. She also noted that before it became involved in this matter, ETC had never

worked with a family longer than forty-six weeks; however, it worked on this case for sixty-seven weeks. Ms. Liechty stated that throughout ETC's involvement, the parents have shown inconsistency with keeping their appointments and with meeting the twins' needs of guidance, supervision, and discipline. She also noted that the parents did not seem to be appropriately concerned about the twins' safety. In conclusion, Ms. Liechty stated that her agency had already conducted more visits than normal and that there was nothing more that it could offer the family. As a result, she requested that ETC be removed from the case.

Ashley Guy, the Department of Children and Family Services case worker assigned to this case, was the fifth witness called by the State. She stated that part of the parents' case plan was to keep in contact with DCFS. Ms. Guy then discussed numerous instances when the mother failed to answer or return her phone calls. With regard to the case plan's requirement that the parents maintain safe and stable housing, Ms. Guy voiced DCFS's concern about who was actually living in the parents' household. She stated that a chief concern was that Joshua Chapman was living in the home even though he had been ordered to not be around the twins.[4] Ms. Guy testified that despite the case plan's requirement that the parents obtain employment, the mother had not done so, although the mother stated that she had applied for and been denied SSD and was appealing that decision. On the other hand, the father had shown DCFS a receipt of him clocking into work at Burger King, but he had not shown proof of his income.

According to Ms. Guy, both of the parents had not completed the counseling that was required by their case plan, despite her having told them that they did not

---

[4] Joshua Chapman is the mother's brother. According to a DCFS report dated March 28, 2012, the mother had been sexually victimized by Mr. Chapman, and DCFS had determined that Ms. Hall had been aware of the abuse but had not protected her daughter from it.

have to pay for such counseling. Ms. Guy explained that the mother had told her that she "just did not want to go to counseling." Due to the many DCFS visits that the mother had cancelled, allegedly due to her health problems, DCFS had become concerned about whether the mother was properly taking her prescribed medications. After some investigation, DCFS learned that the mother had been to various emergency rooms six times during the past year. During that period, the mother had also tested positive for "Benzos[5] and opiates," leading DCFS to require that she undergo a substance abuse assessment. Ms. Guy stated that the assessment revealed that the mother met the criteria for substance abuse treatment, but she had not completed such treatment. With regard to the father, Ms. Guy said that he tested positive for marijuana and opiates in March, had a presumed positive in August for refusing a random test, and had not completed a substance abuse assessment or anger management counseling.

Ms. Guy also stated that DCFS was concerned about the parents' ability to properly parent their twins, noting that they had missed several visits with the twins for reasons that were later proven to be untrue. In addition, DCFS was concerned about traffic coming in and out of the home and the parents' ability to be full-time caregivers of the twins given their having completed only five full weeks out of nineteen weeks of the court-ordered supervised visitation. That concern was magnified when another case worker learned that Ms. Hall had plans to move to a different apartment when and if the twins were returned to their parents' care, thereby leaving the parents to provide for the twins' food, shelter, and medical needs. Ms. Guy also stated that the mother never paid any of the

---

[5] "Benzos" is slang for benzodiazepines which are tranquilizers that are prescribed to relieve anxiety and alleviate insomnia.

required parental contributions and that the father had not paid the contributions since November 2012, noting that one of his relatives had made his obligation current through April 2013. Finally, although the trial court prohibited her from going into any specifics, Ms. Guy explained that neither Ms. Hall nor the twins' maternal grandfather, Johnny Strother, were available as a "placement resource" for the twins because of what DCFS termed "valid" complaints about them.[6] In contrast, Ms. Guy stated that she had no concerns about the twins' current placement with their foster family.

The final witness to testify at the termination hearing was Julia Hall, the twin's maternal grandmother, who was called on behalf of the parents. Ms. Hall stated that the twins' parents have been living in an apartment with her for nearly two years. She explained that although several people, including her son, Johnny, had been living in the apartment with them, no one else had been residing there for the past week. Ms. Hall said that if the parents were to regain custody of the twins, they could all live with her indefinitely. She stated that although she had been willing to let people move in with her in the past, she had told everyone that if her grandchildren were to come home, "everybody had to go." She explained that she worked as a pediatric LPN generally eight hours a day, five days a week, and sometimes on the weekends. Nevertheless, Ms. Hall told the trial court that when she is not working, she is willing to help ensure that the twins' needs are met. Finally, Ms. Hall stated that she has no concerns about the parents' ability to care for the twins should they be returned to their custody.

_____

[6] Ms. Guy explained that a "valid" complaint is of great concern to DCFS because it means that an "investigation was true."

*Analysis*

Louisiana Children's Code Article 1015 provides, in pertinent part:

The grounds for termination of parental rights are:

. . . .

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036, entitled "Proof of parental misconduct," provides, in pertinent part:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

16

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

In *State ex rel. H.A.S.*, 10-1529, pp. 11-12 (La. 11/30/10), 52 So.3d 852, 859 (quoting *State ex rel. K.G. and T.G.,* 02-2886, pp. 4-5 (La. 3/18/03), 841 So.2d 759, 762) the supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing those interest[s], the courts of this state have consistently found the interest of the child to be paramount over that of the parent.

In this case, while both parents testified that they did not want their parental rights terminated, both admitted that the twins were doing well with their foster family. Notably, however, while both parents believed that they had bonded with the twins in their multiple visits as a family, neither Ms. Liechty nor Ms. Guy believed that the parents demonstrated that they had the skills needed or were able to apply the skills consistently to ensure that the twins' basic needs could be met should they be returned to their custody.

After having thoroughly reviewed the record, we conclude that the trial court committed manifest error in finding that the mother and the father were in "substantial compliance with the important features" of their case plan and that

"they must be afforded the opportunity to complete a new case plan." Although the trial court properly recited the law regarding the termination of parental rights, it erroneously applied that law and dismissed the State's petition without making a determination regarding the best interest of the twins. *See State ex rel. A.R.H. v. Hines*, 35,800 (La.App. 2 Cir. 2/27/02), 810 So.2d 1166.

We conclude that the State presented clear and convincing evidence that despite the parents having had over two years and three months since the twins' removal from their custody to accomplish their court-approved case plan, there has been a lack of substantial compliance under each of the elements listed in La.Ch.Code art. 1036(C). In addition, the State presented evidence of "an established pattern of behavior" that indicates that there is "no reasonable expectation of significant improvement in the parent's condition or conduct in the near future." *See* La.Ch.Code art. 1036(D) and La.Ch.Code art. 1015(5). Finally, given the twins' age, the fact that they have spent the majority of their lives with their foster parents, and the parents' lack of interest in and/or their ability to comply with their case plan, we find that it is in the twins' best interest to have their biological parents' rights terminated so that they can be adopted by their foster parents who have for more than two years of their young lives provided them with a "safe, stable, and permanent home." La.Ch.Code art. 1015. The trial court manifestly erred in dismissing the State's petition to terminate parental rights in this case.

**DECREE**

For the foregoing reasons, the judgment of the trial court dismissing the State of Louisiana's petition to terminate the parental rights of K.R.S. and K.S.V. to their minor children, K.S.V. and K.N.D.V., is reversed. Judgment is hereby

18

rendered terminating the parental rights of K.R.S. and K.S.V. to K.S.V. and K.N.D.V. and certifying K.S.V. and K.N.D.V. to be free and available for adoption. Costs of this proceeding are assessed against the parents, K.R.S. and K.S.V.

**REVERSED AND RENDERED**.

19