# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 18-584

## STATE IN THE INTEREST OF M.J.F.

\*\*\*\*\*\*\*\*\*\*

## APPEAL FROM THE
## FIFTEENTH JUDICIAL DISTRICT COURT
## PARISH OF LAFAYETTE, NO. JC-20151015
## HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN E. CONERY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and John E. Conery, Judges.

**AFFIRMED.**

**Nicole M. Guidry**
**Attorney at Law**
**100 South Louisiana Street, Suite 500**
**Abbeville, Louisiana 70510**
**(337) 740-8885**
**COUNSEL FOR APPELLANT:**
        **J. R. F. (Mother)**

**L. Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine Building 3, Room 150**
**Lafayette, Louisiana 70508**
**(337) 262-1555**
**COUNSEL FOR APPELLEE:**
        **Department of Children and Family Services**

**Tracey Davenport-McGraw**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, Louisiana 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corp.**
**Post Office Box 4823**
**Lafayette, Louisiana 70502-4823**
**(337) 237-4320**
**COUNSEL FOR APPELLEE:**
        **M. J. F. (Minor Child)**

**Barry J. Sallinger**
**Allyson M. Prejean**
**Barry J. Sallinger, APLC**
**820 East St. Mary Boulevard**
**Lafayette, Louisiana 70503**
**(337) 235-5791**
**COUNSEL FOR INTERVENORS/APPELLEES:**
        **J. M.**
        **M. M. (Foster/ Potential Adpotive Parents)**

**CONERY, Judge.**

J.R.F., the mother of the minor child M.J.F., appeals the June 7, 2018 judgment of the trial court terminating her parental rights to M.J.F. and certifying him for adoption.[1] The father of M.J.F. is unknown. The trial court's judgment also terminated the parental rights of the alleged unknown father. That ruling has not been appealed and is therefore a final judgment. For the following reasons, we affirm the trial court's judgment in its entirety.

## FACTS AND PROCEDURAL HISTORY

M.J.F. was born on October 17, 2015. Prior to receiving a report of neglect on December 2, 2015, the Department of Children and Family Services (DCFS) had received allegations in October 2015 that M.J.F. was a substance exposed newborn who had tested positive for marijuana and amphetamines at birth. J.R.F. and M.H., the presumed father who had signed M.J.F.'s birth certificate, moved to the Travelodge Motel in Lafayette Parish while there was a pending family service case in St. Landry Parish.

DCFS applied for an Instanter Order of Removal of M.J.F. from J.R.F., the child's mother. The affidavit in support of the December 3, 2015 Instanter Order provided that DCFS involvement was required due to the mother's drug use, inadequate sleeping arrangements for the child (allowing M.J.F. to sleep in the bed with J.R.F. and her companion, M.H.), domestic violence incidents (the Lafayette Police having been called twice due to a domestic disturbance), the mother's expressed need for mental health assistance, and the mother's expressed inability to care for her child. J.R.F. had made threats of wanting to dispose of M.J.F by placing

---

[1] The initials of the children and their parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

him in a dumpster. J.R.F. admitted to using Xanax, ecstasy and marijuana and had been prescribed Depakote as an anti-depressant for post-partum depression.

The Instanter Order was granted on December 3, 2015 and signed on December 4, 2015, committing M.J.F. to the custody of DCFS. A hearing on the continued custody of M.J.F. was fixed for December 8, 2015. Thereafter, the trial court ordered M.J.F. into the care of his foster parents, J.M. and M.M., at the age of eight weeks, where he has remained since that time. J.M. and M.M. are the potential adoptive parents of M.J.F. and are intervenors in this proceeding.

In a random drug test dated December 10, 2015, J.R.F. tested positive for amphetamines, methamphetamines, morphine and marijuana. Based on the stipulation of J.R.F., M.J.F. was adjudicated a "Child in Need of Care" on February 24, 2016. DNA tests were administered to two potential fathers of M.J.F., and both were excluded as the biological father of M.J.F., who remains unknown.

On January 5, 2016 an initial case plan was established by DCFS for J.R.F., followed by five other case plans. The components of the case plans remained the same throughout the proceedings, except that requirements to prevent domestic violence were added to the January 4, 2017 case plan.

The case components included, "stable housing[;]. . .five dollars ($5) a month for parental contributions, complying with drug screens, mental health counseling, employment, positive supports, visits, parent education, and substance abuse counseling – treatment." Domestic violence classes were also added to the case plan.

DCFS maintained custody of M.J.F. and Permanency and Case Review hearings were held and orders signed on the following dates: May 17, 2016, November 22, 2016, May 23, 2017, November 7, 2017, January 23, 2018, and April 9, 2018.

Case plans were filed into the record at the Permanency and Case Review hearings on January 5, 2016, June 7, 2016, May 8, 2017, October 19, 2017, and March 19, 2018. Additionally, court reports were also entered into the record on May 4, 2016, November 7, 2016, May 8, 2017, October 23, 2017, January 10, 2018, and March 26, 2018.

Although the original goal of the case plan had been reunification, on May 8, 2017 the trial court changed the goal for M.J.F. to adoption. On December 6, 2017 DCFS filed a petition for termination of parental rights and certification for adoption. After several continuances, the trial was eventually held on May 7, 2018. After hearing the evidence and receiving the exhibits, the trial court took the matter under advisement and signed its written reasons, erroneously entitled "Judgment" on May 16, 2018, and filed on May 18, 2018.

A formal judgment was signed on June 7, 2018 terminating the parental rights of the mother J.R.F. and the unknown father, thereby freeing M.J.F. for adoption. M.J.F. was two months old when he entered foster care with J.M. and M.M. At the time of trial in May 2018, he was two years seven months old, having been in foster care for almost two and one half years.

J.R.F. does not contest that all of the hearings were timely held, the facts from the case review hearings are correct, and there are no procedural deficiencies in this case. J.R.F. has now timely appealed the trial court's June 7, 2018 judgment of termination of parental rights and certification for adoption.

**ASSIGNMENTS OF ERROR**

J.R.F. asserts the following assignments of error on appeal:

1. In light of the entire record, the juvenile court committed manifest error in terminating J.R.F.'s parental rights without clear and convincing evidence to support the following findings:

      i. No substantial compliance by J.R.F. with the case plan;

ii. No reasonable expectation of significant improvement in J.R.F.'s condition in the future;

iii. Best interest of the child required termination of J.R.F.'s parental rights

## LAW

### *Standard of Review*

The judgment of a trial court terminating parental rights is reviewed on appeal under the manifest error standard of review. *State in the Interest of K.V.*, 14-163 (La.App. 3 Cir. 11/21/14), 161 So.3d 795.

A trial court's factual determinations as to whether there has been substantial compliance with a case plan, whether a significant indication of reformation has been shown, and whether the parent is likely to reform will not be set aside unless the record reflects that the trial court is clearly wrong.

*State in the Interest of G.O.*, 10-571, pp. 5-6 (La.App. 3 Cir. 6/8/11), 68 So.3d 636, *writ denied*, 11-1512 (La. 7/21/11), 67 So.3d 479.

### *Louisiana Children's Code Articles*

Louisiana Children's Code Article 1015(5)(b)-(c), and 1015(6), provide the grounds for termination of parental rights applicable to this case and state:[2]

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

---

[2] Louisiana Children's Code Article 1015 was amended effective August 1, 2018. Judgment was rendered on June 7, 2018 and therefore the prior version of La.Ch.Code art. 1015 applies. However, the pertinent provisions of the article have remained the same.

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

In making its decision on the issue of a lack of parental compliance with a case plan under La.Ch.Code art. 1015(6), the trial court is guided by La.Ch.Code art. 1036(C), which provides a list of factors which may evidence a lack of parental compliance. Further, La.Ch.Code art. 1036(D) may be used to determine whether there is a reasonable expectation of significant improvement in the parent's behavior and actions.

Louisiana Children's Code Article 1036(C) provides:[3]

C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

---

[3] Louisiana Children's Code Article 1036 was amended effective May 15, 2018. Judgment was rendered on June 7, 2018 and therefore the new version of La.Ch.Code art. 1036 applies. Again, the pertinent provisions of the article have remained the same.

5

Louisiana Children's Code Article 1036(D) provides, in pertinent part:

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

. . . .

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Louisiana Children's Code Article 1037(B) (emphasis added) provides:

When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 (clear and convincing evidence) and that it is in the best interests of the child, it **shall** order the termination of the parental rights of the parent against whom the allegations are proven. . . .The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

In cases involving the termination of parental rights, this court in *State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72 (emphasis added) stated:

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id.* Because termination of parental rights is a severe action, **the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence.** La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, **although "only one ground need be established."** *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established,

6

the parental rights may be terminated by the trial court if it is in the child's best interest. *Id*; La.Ch.Code art. 1037.

### *Assignment of Error One-Compliance With The Case Plans*

In its petition for termination of J.R.F.'s parental rights pursuant to La.Ch.Code art. 1015(5)(b)-(c), DCFS alleged and had the burden to prove the following by clear and convincing evidence:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

### *Case Plan Compliance*

The trial court in its written reasons as well as our independent review of the record reflect the following facts were found in connection with J.R.F.'s compliance or lack of compliance with the case plans.

### *Housing*

The trial court found that J.R.F. has been compliant and has maintained her home since November of 2016. However, Ms. Koryan Clay, the DCFS case worker, testified at the termination hearing that J.R.F. was not paying the rent on her home. She stated that J.R.F.'s mother pays her rent and utilities, although "J.R.F. receives some assistance from SMILE at times."

### *Income/Employment*

The trial court found J.R.F. was not compliant with the income/employment component of her case plan. Currently, J.R.F. is not employed. Further, the trial

court found that J.R.F. "did have a couple of part-time jobs during the course of the proceedings but has failed to maintain any full-time employment." Ms. Clay testified that J.R.F. did have a job at Waffle House for a short period, but she was fired based on allegations that she had stolen money from the register. Ms. Clay further testified that J.R.F was not actively seeking employment because she wanted to work on the other aspects of her case plan.

On cross examination, Ms. Clay was questioned about possible employment of J.R.F. at her mother's store and doing side jobs for cash for a family friend identified as Ms. Nicole. However, no documentation had been received by Ms. Clay to verify any employment had taken place and none was furnished to the trial court.

*Parental Contributions*

The trial court found that J.R.F. was not compliant with her parental contributions to DCFS and/or the foster parents of M.J.F. Ms. Clay testified that J.R.F. was to contribute five dollars a month in support of M.J.F. However, Ms. Clay testified that the first contribution to the support of the minor child was a money order for thirty dollars, which was made approximately one week before the trial on May 7, 2018. J.R.F. had failed to provide any contribution toward the support of M.J.F. for the almost two and one half year period that M.J.F. had been in foster care with M.J. and M.M.

J.R.F.'s counsel argues that poverty should not be the "sole reason the court terminates a parent's rights." However, the trial court found, and the record supports, that poverty was not the sole basis of the trial court's termination, rather her continued drug use, her failure to work, her failure to contribute to M.J.F.'s support, and her having another baby all together warranted termination of J.R.F.'s parental rights.

8

*Mental Health Assessment*

The case plan provided that J.R.F. was to "obtain a mental health assessment and comply with all recommendations." The trial court found that she "had not been in compliance with the [sic] portion of her case plan for the majority of the case." Ms. Clay testified J.R.F. "made no effort to obtain a mental health assessment" until January 2018. Ms. Clay testified, and the trial court found that, "In January 2018, she was referred to Acadian Counseling Center, where she is currently receiving services, and is compliant with this portion of her case plan."

*Substance Abuse Evaluations/Recommendations*

The trial court found that with regard to the substance abuse evaluations and recommendations, J.R.F. "has recently become compliant." Ms. Clay testified that on January 3, 2018, she referred J.R.F. to Acadiana Area Human Service District, where she is seeking treatment. The trial court cited the testimony of Ms. Clay, "that J.R.F. has previously been referred to Tyler Mental Health; but she had not completed that program and was discharged and non-compliant at that time."

*Substance Abuse Treatment*

Ms. Clay testified that she referred J.R.F. to Family Preservation and she stayed there for a year. However, Ms. Clay received a February 8, 2017 letter from the Family Preservation team indicating that J.R.F. was discharged "due to non-compliance." Ms. Clay testified that J.R.F.'s discharge was based on her testing positive throughout the program and her "behavior in treatment was defiant, agitated and detached."

*Random Drug Screens*

The trial court found that with regard to the drug screening component of J.R.F.'s case plan, she "has been drug screened numerous time[s] throughout the course of the proceedings and has continued to have positive drug screens and/or not

9

shown up for drug screens." The trial court's findings are based on the testimony of Ms. Clay, who sent J.R.F. to SECON for drug screening. Ms. Clay testified that the last positive drug screen was obtained on February 23, 2018, and that during her entire involvement with J.R.F. she has only had five or six negative drug screens. The written reasons of the trial court indicate that J.R.F. tested positive on March 15, 2018 for marijuana. Her last test on March 30, 2018 was negative.

*Positive Support System*

Ms. Clay testified that at present, J.R.F.'s mother supports her, and a family friend helps out. Ms. Clay also testified that both the mother and the friend are consistent in their support.

*Parenting Classes/Visiting Coaching*

The trial court found that J.F.R. was "to complete a parenting education program and visit coaching." Ms. Clay testified that she initially referred J.R.F. to Family Tree, but shortly thereafter she was placed in the Family Preservation Program. J.R.F. attended Extra Mile and completed their nurturing parenting program but did not compete the visiting coaching portion of the program in November 2016.

J.R.F. was re-referred to visiting coaching in April of 2018, just prior to trial, but was discharged due to non-compliance. Apparently, J.R.F. did not like the visiting coach who was working with her because the coach told Ms. Clay that J.R.F. was pregnant. Due to the lack of other visiting coaches available at Extra Mile, J.R.F. was given the choice of working with her former coach or being discharged from the program, and she chose to be discharged. As a result, the trial court found J.R.F. was only partially compliant with this portion of her case plan.

*Visitation*

The case plan required that J.R.F. was to "maintain contact with the minor child." The trial court found that J.R.F. was only partially compliant with this portion of her case plan. Although J.R.F. had been attending weekly visits since February 18, 2018, J.R.F. only attended thirteen of the fifty-two scheduled visits from May 2017 to May of 2018. J.R.F. did not visit from October 18, 2016 to February of 2017 or from June 17, 2017 to October 5, 2017.

Further, her behavior at the visits was the cause for the requirement that she work with a visiting coach. Her visits with the child were disruptive. Ms. Clay testified that she had attempted to obtain a different visiting coach for J.R.F., but the agency would not pay for the service as J.R.F. was already getting free services from Extra Mile. However, Ms. Clay did testify that J.R.F. had been more consistent with her visits in recent months, and that her interaction with the child was "getting better."

*Domestic Violence Classes*

The trial court found that J.R.F. was required to participate in domestic violence classes and that she was compliant with this portion of her case plan and is "addressing domestic violence with her counselor."

After an independent review of the record, we find no manifest error in the trial court's ruling that J.R.F. is only partially in compliance "with some portions of the plan since the beginning of 2018." We therefore affirm the trial court's finding that DCFS has proven by clear and convincing evidence pursuant to Louisiana Children's Code Article 1015(6) that J.R.F. has failed to substantially comply with the components of her case plan. We find this assignment of error to be without merit.

***Assignment of Error Two - No Expectation Of Significant Improvement***

Pursuant to La.Ch.Code art. 1015(6), DCFS must prove by clear and convincing evidence:

> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

More than two years have elapsed since M.J.F. was removed from J.R.F. Based on our independent review of the record, this court finds, as did the trial court, that in the beginning of 2018, after the DCFS initiated proceedings in December 2017 to terminate J.R.F.'s parental rights and free M.J.F. for adoption, J.R.F. began to make some effort to comply with the terms of her case plan. However, the trial court found that J.R.F. continued to have positive drug screens, and her substance and mental health issues have continued to preclude her from maintaining stable employment and independent housing.

Further J.R.F. is presently caring for a one-year old child, born after M.J.F, though not independently and with continued monitoring by DCFS.

Ms. Clay testified on cross examination that J.R.F. had given her the name of a third possible father for M.J.F. about a week before trial, but DCFS had not had the opportunity to contact him. However, on re-examination Ms. Clay testified that J.R.F. did not provide her with any information on the potential father including his address, date of birth, or any additional information that would assist in finding this individual. As previously stated, two other potential fathers for M.J.F., named by J.R.F. have been excluded by DNA testing.

12

Ms. Clay further testified that J.R.F.'s mother had been considered as a possible placement for M.J.F., however, she tested positive for marijuana, and did not have the living space in her home at the time. Ms. Clay also attempted to contact J.R.F.'s sister, but she failed to respond.

Ms. Clay testified that she felt she had done as much as possible to assist J.R.F. with her case plan and that it was in M.J.F.'s best interest to be freed for adoption.

The trial court found in its May 16, 2018 written reasons:

> The minor child has been in the custody of the Department of Children and Family Services since December 4, 2015. The mother has only recently achieved partial compliance with some portions of her case plan beginning in 2018. Throughout these proceeding[s] she has continuously had positive drug screens, the last one being as late as March 15, 2018. J.R.F. has had over two years to address the issues that brought the minor child into custody. There is no reasonable expectation of significant improvement in J.R.F.'s condition or conduct in the near future.

Therefore, for the reasons stated by the trial court and after a thorough review of the record, we find no manifest error in the trial court's determination that J.R.F. "only recently achieved partial compliance with some portions of her case plan beginning in 2018," and there is a lack of any reasonable expectation of significant improvement by J.R.F. in the near future, as she continues to manifest the same problems that brought the minor child into DCFS's custody. *See* La.Ch.Code art. 1015(5)-(6).

### Assignment of Error Three - Best Interest Of The Child

A trial court may terminate parental rights only if it finds that termination is in the best interest of the child. *See* La.Ch.Code art. 1037(B); *State in the Interest of D.H.L.*, 08-39 (La.App. 3 Cir. 4/30/08), 981 So.2d 906. "This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent."

*State in the Interest of G.E.K.*, 14-682, p. 3 (La.App. 3 Cir. 1/14/15), 155 So.3d 713, 716.

Ms. Clay testified that M.J.F. was doing well in his placement and that his foster parents were attentive to all of his medical needs and his "necessities." With the assistance of J.M. and M.M., M.J.F. is "making tremendous progress." His cognitive therapist reported that M.J.F. is "exceeding" with his colors, shapes and language. Further, M.J.F. has remained in his foster home with J.M. and M.M. for all but eight weeks of his now three year old life. J.M. and M.M. have stated in their petition of intervention that they are able and willing to adopt M.J.F.

In its findings as to the determination of the best interest of the child in relation to the parental rights of J.R.F., the trial court stated:

> The child has a right to permanency and stability which cannot [be] maintain[ed] if placed with [his] mother. It would be an injustice to the child to continue to give the mother unlimited chances to complete her case plan. It is not in the child's best interest to remain in foster care in the hopes that one day [his] mother will address the same issues that brought [him] into care initially. The minor child is in an adoptive placement and has been in the home with the foster parents for over two years.

> Considering the child's young age and need for a safe, stable, and permanent home, the best interest of the child is served by terminating the parental rights of his parents, thereby releasing him for adoption.

We agree with the comprehensive and well-articulated reasons of this experienced trial judge. Based on the record before us and especially considering that M.J.F. has been in the custody of the foster parents J.M. and M.M. for all but eight weeks of his young life, we find no manifest error and affirm the trial court's finding that the termination of J.R.F.'s parental rights and releasing M.J.F. for adoption is in the best interest of the minor child.

14

## CONCLUSION

For the foregoing reasons, we affirm in its entirety the trial court's June 7, 2018 judgment terminating the parental rights of J.R.F. and the unknown father, and certifying M.J.F. eligible for adoption. All costs are assessed to J.R.F.

**AFFIRMED.**