STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

14-681

consolidated with

14-682

STATE IN THE INTEREST OF G.E.K. & C.E.S.

STATE IN THE INTEREST OF I.B.W.

**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. J-2674 C/W J-2737
HONORABLE W. PEYTON CUNNINGHAM, JR., AD-HOC DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

Pickett, J., concurs in part, dissents in part, and assings written reasons.

AFFIRMED.

**Thomas G. Wilson**
**Attorney at Law**
**420 Kings Drive**
**Pineville, LA 71360**
**(318) 201-2807**
**COUNSEL FOR APPELLANT:**
**A.V. (mother)**


**Robert L. Kennedy**
**Attorney at Law**
**352 2nd Street**
**Colfax, LA 71417**
**(318) 627-3255**
**COUNSEL FOR APPELLEE:**
**B.H.W. (father)**


**James P. Lemoine, District Attorney**
**Thirty-fifth Judicial District Court**
**P. O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**


**Guy R. Lain**
**Louisiana Department of Children and Family Services**
**Bureau of General Counsel**
**1648 Carter Street**
**Vidalia, LA 71373**
**(318) 336-8611**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**
**Department of Children and Family Services**


**Renee P. Cote**
**Legal Services of North Louisiana**
**720 Travis Street**
**Shreveport, LA 71101**
**(214) 369-0024**
**COUNSEL FOR APPELLEES:**
**G.E.K. (child)**
**C.S. (child)**
**I.W. (child)**

**Joseph P. Beck, III**
**Attorney At Law**
**5529 Monroe Highway**
**Ball, LA 71405**
**(318) 640-9202**
**COUNSEL FOR APPELLEE:**
     **S.K. (father)**


**Jessica Firment**
**Attorney at Law**
**2915 Jackson Street**
**Alexandria, LA 71301**
**(318) 473-0052**
**COUNSEL FOR INTERVENORS/APPELLEES:**
     **J.V. (intervenor)**
     **H.V. (intervenor)**


**Carolyn O. Hines**
**Attorney at Law**
**728 Jackson Street**
**Alexandria, LA 71301**
**(318) 442-3251**
**COUNSEL FOR APPELLANT:**
     **A.V. (mother)**

**GREMILLION, Judge.**

In this consolidated case,[1] the mother, A.V., appeals the trial court's judgment terminating her parental rights to her three children, G.E.K., C.E.S., and I.B.W.[2] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2010, the State, through the Department of Children and Family Services, (DCFS) received a report that A.V. was in the hospital due to a drug overdose. At that time, A.V. had only one child, G.E.K., born January 13, 2009. A.V. was referred to substance abuse treatment and offered other services from DCFS. In September 2011, DCFS received a report that a second child, C.E.S., was born substance-exposed on September 6, 2011. In an effort to keep the family unified, A.V. and her children were provided various services including daily daycare for the children and substance abuse treatment for A.V. However, A.V. failed to attend substance abuse treatment after numerous attempts by DCFS. The State filed a petition to declare a minor to be a child in need of care in July 2012. Following an August 8, 2012 hearing, A.V. was arrested on outstanding warrants, and G.E.K. and C.E.S. were placed in foster care.[3] At a continued custody hearing on September 12, 2012, all parties stipulated that G.E.K. and C.E.S. were children in need of care.[4] While G.E.K. and C.E.S. were in the State's custody, A.V. gave

---

[1]This case, 14-681, *In re G.E.K. and C.E.S.*, is consolidated with 14-682, *In re I.B.W.*

[2]Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, initials are used throughout to protect the identity of the minors.

[3]A.V.'s brother, R.J.V., and sister-in-law, H.S.V., filed a motion to intervene in October 2012, to facilitate the child in need of care plan and insure that the best interests of the minor children are met. The intervenors, thereafter, filed an opposition to case plan and for other relief urging that the children be placed in their home rather than in the home of foster parents. The State opposed the intervention and filed a peremptory exception to opposition to case plan.

[4]On October 15, 2012, the presiding judge, Judge Warren D. Willett, recused himself because he was related to the foster parents, attended church with the Intervenors, having served on committees with R.J.V., a deacon in the church, and attended Sunday school classes with him.

birth to a third child, I.B.W., on February 14, 2013.[5] The State filed a petition to adjudicate I.B.W. in need of care due to high risk, and he was placed in foster care on February 28, 2013.[6] [7]

The children were continued in the State's custody following a March 6, 2013[8] hearing in which the trial court found that A.V. had made inadequate progress in meeting reunification goals.[9] Thereafter, the State filed a petition for termination of parental rights and certification of minor children for adoption on November 5, 2013.[10] On February 5, 2014, the same day as the hearing on the termination, A.V.'s counsel filed a motion to continue, which was denied. Following the hearing, the trial court terminated A.V.'s parental rights to her three children, freeing them for adoption. A.V. now appeals and assigns as error:

(1) The trial court was in error in terminating [A.V.'s] parental rights to G.E.K., C.E.S. and I.B.W., for the State of Louisiana failed to prove by clear and convincing evidence that there had been no substantial parental compliance with a case plan for services and there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, as mandated by Louisiana Children's Code Article 1035.

(2) The trial court erred in its ruling that the termination of parental rights was in the best interest of the minor child, as mandated by Louisiana Children's Code Article 1037 (A).

---

[5] Although C.E.S. and I.B.W. have different legal fathers as noted on their birth certificates, DNA testing revealed that S.K., the father of G.E.K., is also the father C.E.S. and I.B.W.

[6] I.B.W. was placed in a different foster home than G.E.K. and C.E.S.

[7] A.V. appealed the adjudication of I.B.W. as a child in need of care. A panel of this court affirmed the trial court's adjudication of I.B.W. as in need of care. *In re I.B.W.*, 13-517 (La.App. 3 Cir. 10/9/13), 124 So.3d 567.

[8] The motion to intervene was granted at this hearing.

[9] It was at this hearing that docket number J-2674, *In the Interest of G.E.K. and C.E.S.*, and docket number J-2737, *In the Interest of I.B.W.*, were consolidated.

[10] The petition notes that the State sought permission to terminate A.V.'s rights to I.B.W. pursuant to La.Ch.Code art. 1015(5) even though he had not been in the State's care for over a year. We have held that both a petition to terminate and termination is appropriate when the child has been out of the mother's custody for less than a year when conditions for termination have been met pertaining to older children. *See In the Interest of R.E.*, 12-196 (La.App. 3 Cir. 6/6/12), 91 So.3d 1282 and *In the Interest of C.M.*, 11-54 (La.App. 3 Cir. 6/1/11), 68 So.3d 47.

(3) The trial court erred in not granting the court appointed attorney for [A.V.] a continuance to prepare for the termination proceeding.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., NC*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent. *In re J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *In re V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the following as grounds for involuntary termination:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Louisiana Children's Code article 1037(B) further requires that the trial court find that the termination be in the best interests of the children and that the trial court provide written findings.

The trial court found by clear and convincing evidence that the parental rights of A.V. should be terminated because:

> The State further proved abandonment by [A.V.] and [the father]. The Court finds that [A.V.] and [the father] have abandoned [G.E.K.], [C.E.S.], and [I.B.W.] by failing, as of the time of the filing of the termination petition, to provide significant contributions to the children's care and support. Respondent [the father] has further abandoned [G.E.K.], [C.E.S.] and [I.B.W.] by failing to maintain significant contact with the children by visiting or communicating for a six consecutive month period. The State has further proved that [A.V.] and [the father] have not substantially complied with their case plans and there is no reasonable expectation of their rehabilitation in the near future. Despite the efforts of Petitioner, the Respondents [A.V.] and [the father] have failed and/or refused to adequately participate in the services provided to them; and/or have failed/refused to substantially comply with the case plans for services which have been previously filed by the Department and approved by this Honorable Court as necessary for the safe return of the minor children. Despite earlier intervention, there is no reasonable expectation of significant improvement in the condition or conduct of [A.V.] and [the father] in the near future, considering the children's ages and their need for a safe, stable and permanent home. The Court considered, in accordance with LA ChC Art. 1037(A), the bond of [G.E.K.], [C.E.S.] and [I.B.W.] with their caregivers and all other evidence presented to determine the best interest of each child. The Court finds that the termination of the Respondents' parental rights is in the best interest of [G.E.K.], [C.E.S.] and [I.B.W.] because of their need for a safe, stable and nurturing permanent placement.

A.V. claims that the State failed to meets its burden of proving by clear and convincing evidence that termination was warranted because, despite A.V.'s ongoing substance abuse problems, she had completed some aspects of her case plan.

5

The significant requirements of the State's case plan for A.V. included that she not use any illegal narcotics or prescription medications that were not directly prescribed to her, that she request non-narcotic prescription medication, and that she participate in a substance abuse evaluation and any recommended treatment. She would further submit to drug screens; refusal to participate resulted in a default positive drug screen. A.V. was to maintain safe and appropriate housing for at least six months, and to obtain and maintain a legal source of income to provide for her family's basic needs. She was to attend parenting classes, domestic violence classes, and submit to a mental health evaluation. Further, she was to pay $10 per month, if unemployed, and $25 per month, if employed, in child support.

*Evidence and Testimony*

Several case plan reviews are in the record. A July 9, 2013 case plan review indicated that A.V. had failed to meet the housing, employment/income, and child support payment requirements. However, A.V. maintained contact with DCFS and attended all court hearings and visits with the children. Regarding her drug use, A.V.'s progress was noted:

> [A.V.] took a drug screen on January 25, 2013 and tested positive for Suboxone.[11] She has a prescription for this narcotic. The Agency received a Notification of Non-Compliance on February 22, 2013 concerning [A.V.]. The reasons for non-compliance were failure to attend required group and/or individual sessions, failure to maintaine [sic] adequate progress toward treatment goals and/or objectives, and failure to maintain abstinence form [sic] alcohol/other drugs, as evidenced by positive drug screens. [A.V.] had a negative drug sreen [sic] on February 25, 2013. On March 4, 2013 [A.V.] tested positive for Suboxon [sic]. She has a prescription for this narcotic. Also on March 4, 2013 [A.V.] and the clinician at Grant Addictive Disorders signed a contract. The contract stated that [A.V.] agreed to fully participate in outpatient treatment at Grant Adictive [sic] Disorders. She agreed to attend any and all outpatient group and individual sessions as well as submit to random urine screens when required.

---

[11]Suboxone is used to treat opiate addiction.

6

Supervisor requested [A.V.] to take a drug screen after court on April 24, 2013. A.V. did not comply. This is considered a positive. On April 30, 2013 [A.V.] tested positive for Suboxone. She has a prescription for this narcotic. On May 3, 2013 [A.V.] tested positive for Suboxone. She has a prescription for this narcotic. On May 29, 2013 the Agency received a letter of Notification of Termination at Grant Addictive Disorder concerning [A.V.]. The leter [sic] stated that [A.V.] has been given several opportunities to attend outpatient treatment and cooperate with the program and she has [sic] failed to do so. On June 17, 2013 [A.V.] had a negative drug screen.

The case plan further stated that DCFS had received a letter on March 1, 2013 from A.V.'s physician indicating that he had no intention of weaning A.V. off of Suboxone at that time. A July 12, 2013 judicial review report submitted to the trial court discussed A.V.'s compliance and again reiterated A.V.'s failure to comply with the demands of Grant Addictive Disorders Clinic. This report states:

Please see below for drug screen dates and what she tested positive for:
1/25/13     Suboxone
2/25/13     Negative
3/04/13     Suboxone
4/24/13     Agency requested drug screen after court, [A.V.] did not submit to it.
4/30/13     Suboxone
5/03/13     Suboxone
6/17/13     Negative

The Agency has major concerns of [A.V.] taking Suboxone considering the length of time she has been on this narcotic medication. However, the Agency received a letter dated March 1, 2013 from Dr. Seki. He stated he has no intentions to wean her off of Suboxone at this time. He stated she is "doing exceptionally well as evidenced by being tested negative for drugs and attendance to NA/AA meetings." [A.V.] signed a consent form to release her records from Dr. Seki's office. The records were sent to our office in February 2013 as well as the following drug screens.

This review also noted that on July 3, 2013, at a parenting class A.V. was attending, a caseworker called 911 emergency services to transport A.V. to the hospital because she was not "doing well" and almost dropped I.B.W. The caseworker reported that A.V. admitted that she relapsed the night before because

she was very depressed over the fact that her brother was trying to take her children from her. By July 9, 2013, the case plan cover sheet lists adoption of the children as the primary goal.

Testimony from the March 6, 2013 hearing included the following. Don Jones, a child welfare specialist with DCFS, testified regarding the removal of I.B.W. shortly after birth. Jones noted that A.V.'s "primary issue seems to be substance abuse." Although I.B.W. was born healthy and had no withdrawal symptoms, he did have Suboxone in his system, which had been prescribed to A.V. At the initial meeting with A.V., Jones found that I.B.W. was not in present danger. However, following a staff meeting, it was determined that I.B.W. was in impending danger because of A.V.'s "noncompliance with the agency as reported by foster care and her extensive history with substance abuse."

Lori Bardwell, Child Welfare Supervisor for the Grant and Rapides Parish DCFS, testified regarding the removal of I.B.W.:

> Mr. Jones reported back to me that he had frankly discussed with [A.V.] and her current paramour that the importance of them working with the agency; that she had the two children in foster care already; that she was lacking in working her case plan and that was very serious. He further discussed that they needed to do everything that the agency requested; that we would be closely watching and monitoring them and that should they not do anything that the agency requested that we would immediately remove the child.

Bardwell testified that A.V. did report for a drug screen as requested and tested positive for Suboxone. However, Bardwell stated that "[d]ue to [A.V.'s] noncompliance with her family services and her current foster care case plan, and her paramour's unwillingness to go for his drug screen, we concluded that it was in the child's best interest that he entered into foster care."

Debra Faircloth, a domestic violence advocate, testified that she had provided A.V. with domestic violence counseling and parenting sessions since late November 2012. Faircloth stated that A.V.'s behavior and appearance was always appropriate and that she never appeared to be impaired.

A.V. testified that she is actively working her case plan and that the she is only taking her prescribed medication Suboxone. She said that she lives with her fiancé, B.W. A.V. said that she does not work but has applied for Supplemental Security Income. She testified that she was in a car accident in 2000, and that her addiction to pain medication resulted.

*February 5, 2014 Hearing*

Bardwell testified regarding A.V.'s history with DCFS, starting with the 2010 incident in which she overdosed. A.V.'s case was closed, and she was referred for services. In September 2011, C.E.S. was born exposed to Lortab, and A.V. tested positive for marijuana, Klonopin, and opiates. At that time, the family was placed in family services, which is an intensive intervention program that seeks to maintain the family unit. However, the children entered foster care on August 8, 2012, due to A.V.'s noncompliance with her case plan and her arrest on outstanding warrants. Bardwell said that A.V. participated in all five family team conferences in which her case plan was discussed. Bardwell then reviewed A.V.'s case plans and A.V.'s failures to meet her case plan by failing to obtain a legal source of income, failing to maintain safe and appropriate housing, and failing to complete any substance abuse treatment. Bardwell then reviewed A.V.'s drug screens as follows:

4/2012  Soma, Xanax, Suboxone, but had prescriptions for
     Hydrocodone and Suboxone.

6/22/2012   Suboxone, Klonopin, and Hydrocone, but had prescriptions for all three.

8/15/2012   Suboxone and Klonopin, which were prescribed, and Xanax and morphine, which were not prescribed.

9/06/2012   Suboxone and Klonopin, which were prescribed, and Soma and Xanax, which were not prescribed.

9/07/2012   Marijuana and Benzodiazepines, not prescribed.

10/11/2012  Suboxone, prescribed.

11/01/12    Suboxone and Klonopin (prescribed), Soma and Xanax (not prescribed).

12/13/12    Suboxone (prescribed).

1/03/13     Opiates, hydrocodone and Soma (not prescribed).

1/17/13     Refused drug screen (automatically deemed positive).

1/25/13     Suboxone (prescribed).

2/25/13     Negative.

3/04/13     Suboxone (prescribed).

4/24/13     Refused drug screen (automatically deemed positive).

4/30/13     Suboxone (prescribed).

5/03/13     Suboxone (prescribed).

6/17/13     Negative.

8/23/13     Negative.

Bardwell testified that all three children have thrived in their foster home placements. She said that all three children get together at least once per month because the foster mothers have become friends. She said that the foster parents desire to adopt the children if they are freed for adoption.

Candace Gillette, Child Welfare Specialist, became the foster care worker for the children in February 2013. Gillette essentially reiterated Bardwell's

10

testimony that A.V. was non-compliant with her substance abuse treatment. A.V. attended five of sixteen parenting classes. She was briefly employed at Jordache, but never supplied any proof of employment. She sometimes lived with her boyfriend, B.W., and sometimes lived with her mother, M.V. However, the caseworkers were not allowed inside either residence. M.V.'s home was found to be unsuitable by the agency. Although A.V. claimed to have made some of the child support payments, she never provided proof of those payments to Gillette.

Gillette stated that the children are "doing great" in their foster home placements. G.E.K. is in pre-k and will start playing t-ball in the spring, and C.E.S. "says a lot of words" and likes to play in the dirt and jump on his little trampoline. I.B.W. is pulling up now and crawls everywhere. Gillette said the kids are bonded with their respective foster parents. She said that G.E.K. refers to her foster parents as "momma" and "daddy" although the foster mother continues to tell G.E.K. that A.V. is also her "momma." Gillette stressed the need for permanency for these children, as they all have spent the majority or the entirety of their lives in foster care.

Gillette discussed the home where A.V. normally resides; her mother's home. Although she has never been able to conduct an in-home study because they are either not there or refuse entry; Gillette testified as to the exterior conditions of the home. Photos were submitted evidencing piles of furniture, junk, garbage, and debris piled up on the porch and outside the home. Both Bardwell and Gillette testified that beside her substance abuse issues, A.V.'s mother is her biggest problem, and she enables the drug use and takes over and controls A.V.'s visitations with the children.

Kati Wolf, a counselor-in-training at the Grant Addictive Disorders Clinic, testified regarding A.V.'s attendance at outpatient treatment. Wolf stated that A.V. has been enrolled in the program several times but has never completed treatment. She stated that the drug screens A.V. submitted to were negative for illegal substances; however, A.V. only arrived for testing sporadically when the tests were meant to be given weekly.

Kimberly Chellette, who was employed by the Volunteers of America, completed three "visit coachings" with A.V. and five of sixteen parenting classes. Chellette was able to observe A.V. in the presence of her children and noted that she "struggles" and "needs constant help." Chellette then described the July 3, 2013 incident in which 911 had to be called and A.V. taken to a local hospital. Chellette's last contact with A.V. was on July 17, 2013, despite repeated attempts to provide continued services to her.

A.V.'s application for supplemental security income was admitted into evidence along with an August 6, 2013 letter from the administrator of church-run recovery group which A.V. had attended every Saturday for about a month. A.V.'s mother was also involved in the group. The program administrator noted that he was "convinced of both ladies['] sincerity in their desire to pursue recovery for their family through this program."

*Compliance with Case Plan*

More than a year after her children were removed from her care, A.V. had failed to completely accomplish any of the goals set forth in the case plan pertaining to the root of her problems—her substance abuse. She further had no income, no stable housing, produced no evidence that she paid the support required, or was in any way capable of caring for her three children. The trial court did not

manifestly err in its factual determination that A.V. failed to make the $10.00 monthly payments. A.V. claimed to have made payments and testified that she was instructed to keep copies of the payments, but was unable to produce any records of payment. Although A.V. maintained contact with the agency and visited with her children, these two factors are simply insufficient to find substantial compliance with the State's case plan. Although it is debatable whether this should be the case, the law does not require that the clear and convincing evidence of failure to comply pertain only to the main issue that usually initiated the removal in the first place (i.e. drug use). Clear and convincing evidence of failure to meet any of La.Ch.Code art. 1015 grounds is sufficient. In *In re R.E. & R.C.*, 12-196 (La.App. 3 Cir. 6/6/12), 91 So.3d 1282, a panel of this court addressed circumstances very similar to the ones at hand. There, the youngest child was born after the oldest two had already been removed, and the mother's rights to all three children were terminated even though less than a year elapsed since the youngest child had been out of the mother's custody. Moreover, the mother's problems were rooted in her substance abuse, yet, we found no error in the trial court's finding that failure to provide significant contributions to the child's care ($10.00 monthly payment) was a ground for termination.

Nevertheless, the fundamental problem preventing reunification in this case is A.V.'s substance abuse. A.V. makes a large issue of the fact that she was prescribed the Suboxone which was often found in her drug screens. The issue of whether the State's demand that she request non-narcotic medication should supersede her physician's judgment in continuing to prescribe Suboxone is of no moment. A.V. continued to test positive for various other non-prescribed illegal substances, refused drug screening which are automatically deemed positive, and

13

arrived for testing at her leisure rather than when scheduled. Moreover, she refused to complete any outpatient or inpatient substance abuse treatment. A parent who is serious about having her children returned, regardless of their addictions, should attend the treatment requested and provided for by the state. A.V. offers no valid reasons why this treatment, either inpatient or outpatient, could not be accomplished, particularly in light of the fact that she has no job that she needs to tend to. Accordingly, we find no error in the trial court's ruling that the State proved by clear and convincing evidence that A.V. failed to substantially comply with her case plan, particularly the requirements set forth in La.Ch.Code art. 1036(C)(4), (5), (6), and (7). This assignment of error is without merit.

*Reasonable Lack of Expectation of Significant Improvement*

Louisiana Children's Code Article 1036(D) states:

Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

A.V. argues that there is a reasonable expectation of reformation. Louisiana Children's Code Article 1036(C) illustrates the considerations that the trial court takes in determining whether there is a reasonable expectation of reformation. *In*

14

*re S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445. Mere cooperation with DCFS is inadequate; the parents must show improvement over time, even if all of the problems that caused the removal have not been eliminated. *Id.* This requires that the parents significantly modify the behavior that caused the removal. *Id.*

Perhaps it could be argued that A.V. has shown some improvement regarding her addiction because she has tested negative for illegal substances from January to August 2013. However, A.V. did continue to test positive for Suboxone. She further missed screenings or arrived at screenings when she deemed fit, presumably when she knew she would test negative. This is too little, too late. Moreover, there is no indication that A.V. will be able to provide for any of the children's most basic needs including food, clothing, or shelter. Considering the multiple hurdles that A.V. has yet to overcome, the trial court did not err in finding that there is no chance of reasonable expectation of significant improvement in the future.

*Best Interests*

A.V. argues that the State "failed to put on any factual testimony, expert or otherwise . . . as to how this termination would benefit the minor child [sic] or in the alternative, how a refusal to terminate the mother's parental rights would harm the child [sic]." We disagree. Numerous state employees testified. The State has been involved with A.V. beginning in 2010, and has offered its services and various programs to no avail. We cannot see how the trial court could err in finding that it would be in the best interests of the children to permanently be adopted in the stable homes they have resided in rather than subject to a succession of boyfriends, residences (the fallback residence being deemed unfit), and the neglect of their mother who failed to make any substantial progress in meeting any

of the case plan goals. The trial court found that it would be in the best interests of these children, who have had stable homes in which they have thrived, to maintain the permanency they have achieved in their foster placement. We agree and find no error in that finding. Accordingly, this assignment of error is without merit.

*Continuance*

Louisiana Children's Code article 1032 states:

> Upon a showing of good cause and notice to the opposing party, the court may grant, deny, or restrict a requested continuance of the proceeding. The court shall avoid delays in resolving the status of the parent and in achieving permanency for the child.

A.V. argues that the trial court erred in failing to grant a continuance on the day of trial. A.V.'s most recent counsel was appointed on January 9, 2014, but only filed his motion on the eve of the hearing. We find no error in the trial court's refusal to grant a continuance. Counsel had ample time to assemble a witness list and the trial court did not err in finding that the best interests of the children, the oldest two who had been in the State's care of for over two years, would not be served by another continuance. A.V. offered no indication what these witnesses could have provided to refute the fact that she failed to complete her case plan or that there was a significant expectation of reformation in the future. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court terminating A.V.'s parental rights to her three children, G.E.K., C.E.S., and I.B.W., is affirmed.

**AFFIRMED**.

16

STATE IN THE INTEREST OF G.E.K., C.E.S, AND I.B.W.


**Pickett, J., concurring in part and dissenting in part.**

I concur in the opinion of the majority insofar as it affirms the judgment of the trial court terminating the parental rights of the mother to the two older children, G.E.K. and C.E.S. (docket number 14-681). I respectfully dissent from that portion of the opinion terminating the parental rights of the mother to the infant I.B.W. (docket number 14-682).

In my opinion, the state simply piggybacked the case of the third child onto the open case involving the older children. There was never an independent case plan addressing I.B.W.'s needs, his name was simply added to the existing case plan of his siblings. I believe the nature of these cases is so serious that such shortcuts should not be taken before terminating parental rights. I would affirm the judgment of the trial court in 14-681 and reverse the judgment of the trial court in 14-682.

I have reviewed this court's opinion in *State in the Interest of R.E.*, 12-196 (La.App. 3 Cir. 6/6/12), 91 So.3d 1282. In that case, the judge entered a separate order allowing the state to proceed with the termination proceeding even though one year had not elapsed since the child had been in the state's custody. I have also reviewed *State in the Interest of C.M.*, 11-54 (La.App. 3 Cir. 6/1/11), 68 So.3d 47, with which I simply disagree.

The mother in this case has shown herself to be incapable of staying off drugs long enough to care for her children. But she is entitled to the full protection of the law before her parental rights are terminated by the state. I.B.W. has been in foster care and is not in any danger from his mother at this time. Our statutes provide for an expedited process when other children have been terminated, or the state could have simply waited a couple more months to allow the requisite time to lapse.