NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-188

STATE IN THE INTEREST

OF

K.D.L., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 2014JU115
HONORABLE THOMAS  DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN D. SAUNDERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Elizabeth A. Pickett, Judges.

AFFIRMED.

Cooks, J., concurs and assigns written reasons.

**Nicole M. Guidry**
**Attorney at Law**
**100 S. Louisiana, Suite 500**
**Abbeville, LA 70510**
**(337) 740-2149**
**COUNSEL FOR OTHER APPELLEE:**
    **D. M. - father of K.L.(4)**
    **J. L. - father of K.L.(2)& K.L.(3)**
    **D. L. - father of K.L.(1)**
    **C. S. - father of K.L. (5)**

**Franchesca Hamilton-Acker**
**Acadiana Legal Service Corp.**
**P. O. Box 4823**
**Lafayette, LA 70502-4823**
**(337) 237-4320**
**COUNSEL FOR OTHER APPELLEE:**
    **K. L (1)**
    **K. L.(2)**
    **K. L.(3)**
    **K. L.(4)**
    **K. L.(5)**

**Aimee Hebert**
**Assistant District Attorney**
**Fifteenth Judicial District Court**
**100 N. State Street, Suite 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR OTHER APPELLEE:**
    **State of Louisiana**

**Chantel Conrad**
**825 Kaliste Saloom Road**
**Brandywine III, Suite 150**
**Lafayette, LA 70508**
**(337) 262-2250**
**COUNSEL FOR OTHER APPELLEE:**
    **State of Louisiana, Department of Children & Family Services**

**Laticia Lewis**
**In Proper Person**
**1401 Isreal Parker Dr., Apt 3**
**Abbeville, LA 70510**
**(337) 251-8186**
**COUNSEL FOR OTHER APPELLANT:**
    **L. L. - mother**

**SAUNDERS, JUDGE.**

Five minor children came into the custody of the State when the Agency received a report of sexual abuse and neglect. According to the report, the mother's boyfriend molested one of the children. At the time, the five children were residing with their mother in her boyfriend's home. When the information was given to the mother, she stated that the child was lying. Due to the child's statement and the living arrangements of the family, a safety plan was put in place, and the mother and children moved into the mother's maternal aunt's home. Subsequently, the mother moved out of that home, but the children remained. The five children, which includes a pair of twins, have four different biological fathers. At the time, three of the four fathers were either incarcerated, or their whereabouts were unknown. One resided in Kaplan, Louisiana, and none of the fathers were providing support for his child/children. The mother has extensive history with the Agency, and the children had been placed in the custody of the State on two prior occasions. The mother also suffers from mental illness or mental deficiency which, based upon expert opinion, renders her unable or incapable of exercising parental responsibilities without exposing the minor children to a substantial risk of harm. Citing noncompliance with the case plan, the State filed a petition to terminate parental rights and certify the children eligible for adoption. The trial court granted the State's requested relief and terminated the parental rights of all the parties involved. The mother now appeals.

For the following reasons, we affirm.

I.

**ISSUE**

We must determine whether the trial court erred in terminating the parental rights of the mother for noncompliance with her case plan.

## II.

## STANDARD OF REVIEW

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A trial court's findings on whether parental rights should be terminated are subject to the manifest error standard of review. *State in the interest of K.G.*, 02-2886 (La. 3/18/03), 841 So.2d 759.

## III.

## FACTS AND PROCEDURAL HISTORY

This termination action deals with the mother, L.W.L, and her five minor children, K.D.L., K.J.L., K.A.D.L., K.A.R.L., and K.A.R.L.(2), who have an extensive history with the Agency, as the children have been placed into the State's custody on two prior occasions. Pursuant to an Instanter Order dated November 3, 2014, the children were placed into the custody of the State when the Agency received a report that K.D.L. was being molested by L.W.L.'s boyfriend. At the time, the family was residing with L.W.L.'s boyfriend.

On October 22, 2014, K.D.L. was interviewed at Hearts of Hope and disclosed that L.W.L.'s boyfriend had touched her inappropriately several times. When the information was given to L.W.L., she stated that the child was lying. Due to K.D.L.'s statement and the living arrangements of the family, a safety plan was put in place, and L.W.L. and her children moved into L.W.L.'s maternal aunt's home, to whom she planned to give guardianship.

On October 28, 2014, L.W.L. got into a verbal altercation with her maternal aunt and moved out of the home but allowed the children to remain. Subsequently,

2

the children were removed from the maternal aunt's home when she refused to become a certified caretaker.

The children, which includes a pair of twins, have four different biological fathers. At the time, three of the four fathers were either incarcerated, or their whereabouts were unknown, and one resided in Kaplan, Louisiana. None of the fathers were providing support for their child/children.

The Agency filed a Petition for Termination of Parental Rights and Certification for Adoption on April 11, 2016. The attorney for L.W.L. filed and was granted an Exception of No Right of Action at the April 26, 2016 Answer hearing. The Agency was granted an Order dismissing the Petition without Prejudice on May 9, 2016.

On November 21, 2016, the Agency filed its Second Petition for Termination of Parental Rights and Certification for Adoption. In its petition, the State alleged that pursuant to La.Ch.Code art. 1015(6), the parental rights of L.W.L. should be terminated inasmuch as the conditions that led to the children's removal and similar potentially harmful conditions continued to exist as 1) throughout the proceedings, L.W.L. maintained a relationship with the alleged perpetrator of the sexual abuse on K.D.L. and continued not to believe the allegations of sexual abuse made by K.D.L.; 2) the Agency had concerns about L.W.L.'s ability to competently parent the children; and 3) based upon L.W.L.'s pattern of behavior and an expert opinion, there was no reasonable expectation that L.W.L. would significantly improve in redressing the problems preventing reunification with her children.

Permanency and Case Review Hearings were held on October 18, 2016, January 31, 2017, June 20, 2017, and September 27, 2017, in which L.W.L. was present. Moreover, the fathers were either present, represented by counsel, or had been personally or domiciliary served and had failed to appear. At each of the

3

hearings, the trial court found that the Agency had made reasonable efforts, based on the health and safety of the children, to finalize the permanent plan of Adoption.

L.W.L. has a criminal history, and she currently has a pending charge for contributing to the delinquency of a juvenile. In 2009, L.W.L. was convicted of cruelty to a juvenile and was on probation for those charges. L.W.L. suffers from mental illness or mental deficiency which renders her unable/or incapable of exercising parental responsibilities without exposing the minor children to a substantial risk of harm.

L.W.L. was provided with a case plan aimed at reunification with a second/concurrent plan for adoption that addressed the following: maintain stable housing and income, maintain contact with the agency, address mental health issues, complete substance abuse treatment, make parental contributions, and complete parenting classes. Likewise, each of the fathers were provided with a similar case plan.

The trial was held on November 13, 2017. Judgment was granted terminating L.W.L.'s parental rights. The father's parental rights were also terminated, and the children were certified free for adoption. It is from this termination of parental rights that L.W.L. appeals. The fathers did not appeal.

IV.

**LAW AND DISCUSSION**

L.W.L. asserts that the trial court erred in determining that she failed to substantially comply with her case plan, such that termination of her parental rights pursuant to La.Ch.Code art. 1015(6) is unwarranted. Specifically, L.W.L. argues that she had housing; employment; clean screens; was bonded and communicated with her children; and was cooperative and available.

At the time the State filed the current action, La.Ch.Code art. 1015 set forth eight grounds for termination of parental rights; however, the State need only establish one ground for termination. In addition, La.Ch.Code art. 1035(A) states that, "[t]he petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." State in the interest of J.M., 02-2089, pp. 9-10 (La. 1/28/03), 837 So.2d 1247, 1253.

"A lack of parental compliance may be shown with proof of either failure to visit the child, to communicate with the child, failure to contribute to the cost of the child's foster care or failure to comply with the required treatment and rehabilitation services." State in the Interest of J.K.G., 11-908, p. 6 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 15 (quoting *State In the Interest of M.H. v. K.W.H.*, 40,332, p. 8 (La.App. 2 Cir. 9/23/05), 912 So.2d 88, 94). L.W.L.'s case plan included certain requirements that had to be met in order for her to be reunited with her children. These requirements included: 1) maintain stable housing; 2) income; 3) maintain contact with the agency; 4) treat the mental health issues; 5) substance abuse treatment; 6) make financial contributions; and 7) complete parenting classes.

**Stable Housing:**

The first requirement of L.W.L.'s case plan was that she obtain stable housing. DCFS caseworker Lindsey Gleason ("Gleason") testified regarding her involvement in this matter. Gleason testified that she had been the case worker for the majority of the life of the case; that the children came into the Agency's care on or about November 3, 2014; that they had been in the State's custody since that time, and that they were adjudicated "in need of care" on or about February 23, 2015.

Gleason testified that during the life of the case, L.W.L. moved several times: 1) first from her boyfriend's residence into her maternal aunt's residence; 2) next into a different home for approximately five months; (3) again into a different home in Abbeville; and (4) finally, into her current home where she had been residing for the past year and a half. Gleason testified that the home is a three-bedroom, furnished, with running utilities, that overall L.W.L. kept clean. Gleason testified that in approximately August of 2017, there was a girl living in the home with L.W.L., and that in September of that same year, there was evidence of some offshore fishing poles in the home that she believed belonged to L.W.L.'s former boyfriend and alleged perpetrator of the sexual abuse on K.D.L. Gleason further testified that L.W.L. had been advised several times that in order to have her children returned she was not to have contact with her former boyfriend.

**Income:**

The second requirement of L.W.L.'s case plan was that she provide proof of income. Gleason testified that L.W.L. verified that her source of income was a monthly disability check.

**Maintain contact with the Agency:**

The third requirement of L.W.L.'s case plan was that she maintain contact with the Agency. Gleason testified that for the most part, throughout the life of the case, L.W.L. remained in consistent contact with the Agency.

**Mental Health Treatment:**

The fourth requirement of L.W.L.'s case plan was that she receive treatment for her mental health issues. Gleason testified that L.W.L. was diagnosed by Dr. Conception, a psychiatrist, in 2011 with an unspecified disorder for which she was prescribed Seroquel, Trileptal, and Celexa; that she continues to receive her medication at his office; and that her treatment is ongoing. Gleason testified that

L.W.L. failed to consistently take the medication prescribed to her. Gleason further testified that Dr. Henry Lagarde, a licensed Clinical Psychologist, rendered a report on July 21, 2016, that indicated that L.W.L's parenting skills were deficient and that she herself currently does not want to raise her children because it would mean less involvement for her children with DCFS.

**Substance Abuse Treatment:**

The fifth requirement of L.W.L.'s case plan was that L.W.L. undergo substance abuse treatment. Gleason testified that L.W.L. tested positive for marijuana and methamphetamines in January 2017; on January 23, 2017, L.W.L. was positive for amphetamines, methamphetamines, and marijuana; on January 30, 2017, L.W.L. was positive for marijuana; on February 7, 2017, L.W.L. was positive for marijuana; on February 15, 2017, L.W.L. was positive for marijuana; and on February 20, 2017, L.W.L. was positive for marijuana. Gleason testified that L.W.L. admitted that she used illegal substances during the course of the proceedings. Gleason further testified that at the time of trial L.W.L. had not completed any substance abuse treatment program and that she was arrested twice during the life of the case.

**Financial Contributions:**

The sixth requirement of L.W.L.'s case plan was that L.W.L. make financial contributions. Gleason testified that L.W.L. did not make her first financial contribution until two years and two months after the children came into care. Gleason further testified that L.W.L. did, at times purchase clothing, food, and other items for the children.

**Parenting Education Classes:**

The seventh requirement of L.W.L.'s case plan was that she complete a parenting class. Gleason testified that L.W.L. did complete a parenting class.

However, Gleason testified that L.W.L. exhibited an inability to properly parent her children during visits with them. Gleason further testified that during the visits the children were "chaotic." Angie Comeaux, Court Appointed Special Advocate (CASA) volunteer assigned to the case for two years at the time of trial, made the same observation.

Given the above, we find no manifest error in the trial court's determination that while L.W.L. made an effort to work her case plan, there are things that are not fixable with regards to L.W.L.'s abilities and capabilities to parent her children. The trial court stated, and we agree, that:

> [B]ased on Dr. Lagarde's opinion . . . her parenting capability is deficient, that modulation of cognitive and emotional process is impaired. The problem in this case, as I have had it through history throughout – you can see it from the CASA testimony, from the case worker's testimony - - I think there's effort, but there's something that lacks in your ability to provide safety for these children. The fact that you continue, to this day, to not believe your child's claims with regards to sexual abuse of a paramour of yours and your continued relationship with that person maybe the last, as I heard it, maybe the last month you have severed that relationship, the idea that you would continue to have a relationship with a man who, at best, your child is telling you a lie, but at best you fail to believe and you continue to have that relationship. So those were some of the things that cause me to be concerned about the expectation for safety for your children should they be returned to you.
>
> Your children have been removed on two occasions prior, you have -- you've been convicted of cruelty to a juvenile of one of your children, and presently there's a charge pending of cruelty to a juvenile. It's these factors that cause this Court, in addition to any observation during court hearings over the years of this time, that I just believe that these children need a safe place and a place where they can feel safe in their being raised and I believe, for the reasons set forth, that you cannot provide that.
>
> And so for those reasons, the Court is going to terminate your parental rights at this time.

Thus, the conditions which led to the children's removal continued to exist at the time of trial.

**Best Interests of the Child:**

A trial court may terminate parental rights only if it finds that termination is in the best interest of the child. *See* La.Ch.Code art. 1037(B). *See* State in the Interest of D.H.L., 08-39 (La.App. 3 Cir. 4/30/08), 981 So.2d 906. "This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent." State in the Interest of G.E.K., 14-682, p. 3 (La.App. 3 Cir. 1/14/15), 155 So.3d 713, 716.

With regards to L.W.L., the court found that although L.W.L. substantially complied with her case plan, and there was a reasonable expectation that with time L.W.L. could be totally compliant with her case plan, there are things that are not fixable with regards to L.W.L.'s abilities and capabilities to parent her children. The court further found that the children's need to for a place where they can feel safe in their being raised, outweighed L.W.L.'s substantial compliance with the case plan. Given the accuracy of the above and the evidence of such in the record, we uphold the trial court's finding that terminating L.W.L.'s parental rights is in the best interest of the children.

IV.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court terminating the parental rights of L.W.L., T.Q.B., D.D.M., J.J.L., and C.D.S., and certifying K.D.L., K.J.L., K.A.D.L., K.A.R.L., and K.A.R.L.(2) eligible for adoption, is affirmed.

All costs are assessed to L.W.L.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules– Courts of Appeal, Rule 2–16.3.

9

STATE IN THE INTEREST

OF

K.L. ET AL.

**Cooks J., Concurs.**

It is always a weighty decision when deciding whether a parent should be permanently separated from his or her child. This case is particularly gut-wrenching because I am satisfied that the mother loves her children and stood before us at oral argument passionately and earnestly pleading for the right to continue parenting her offspring. The circumstances she finds herself in today is the sad consequence of happenstance and the economic misfortune of those born without sufficient means or ability to earn a living wage. This mother suffers admittedly from mental illness and, as she explained, the man who is accused of sexually molesting her daughter provided a place for her and the children to live and he provided enough funds to take care of the other needs of her family. No charges have been filed by the State against the alleged perpetrator. But this mother has been dealt a bad deck of cards even though she insists that she can live without him in her life if she can keep her children. The mother's sole income is just over $800 per month in SSI benefits and she continues to struggle with her mental illness and admitted use of marijuana and other unprescribed drugs. She also has exceeded, on occasions, the acceptable limits of parental discipline resulting in criminal charges being lodged against her. I am moved by her insistence that she did not mean to hurt her child—her response was probably prompted in large measure by her mental limitations. There is one silver lining for this mother, though I, too, must join the majority in affirming the decision

1

below—her children are old enough to remember her beyond the age of eighteen and they will have the right at that age to restore, if desired, their relationship with her. For these reasons I concur in the majority's affirmance.