# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**20-252**


**STATE IN THE INTEREST OF**

**I. A.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC2017706
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
### JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.


**AFFIRMED.**

**Corrie R. Gallien**
**Public Defender**
**15th Judicial District Court**
**600 Jefferson Street, Suite 901**
**Lafayette, LA 70501**
**(337) 714-9077**
**COUNSEL FOR APPELLANT:**
     **In. A. (mother)**

**Keith A. Stutes**
**Lafayette Parish DA**
**Christian B. Landry**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR OTHER APPELLEE:**
     **State of Louisiana**

**Jennifer O. Robinson**
**413 Lee Avenue**
**Lafayette, LA 70501**
**(337) 237-0503**
**COUNSEL FOR OTHER APPELLEE:**
     **I. A. (child)**

**Leah Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine Bldg 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-1555**
**COUNSEL FOR OTHER APPELLEE:**
     **Department of Children and FamilyServices**

**Lloyd Dangerfield**
**P. O. Box 91908**
**Lafayette, LA 70509-1908**
**(337) 232-7041**
**COUNSEL FOR OTHER APPELLEE:**
     **Donald Griffen a/k/a Donald Griffin**

**KYZAR, Judge.**

In.A.[1] appeals from a trial court judgment terminating her parental rights based upon a finding that she failed to substantially comply with her case plan, that there was no reasonable possibility of her complying with her case plan in the near future, that it was in the best interest of her child that her parental rights be terminated, and certifying the child as eligible for adoption. For the following reasons, we affirm the decision of the trial court.

## DISCUSSION OF THE RECORD

The facts of this case present a tragic and extremely unfortunate circumstance. In.A., herself a minor, is the mother of the minor child I.A., born on September 15, 2017. The core facts were set forth in a previous appeal to this court in *State in Interest of I.A.*, 18-641, pp. 1-4 (La.App. 3 Cir. 4/3/19), 269 So.3d 881, 882-84, as follows:

> On August 2, 2017, In.A. was placed in the custody of the Department of Children and Family Services (DCFS) after allegations were made that she had been sexually abused. She was eleven years old. She complained of stomach pain while in DCFS custody and was taken to a nearby hospital, where personnel ascertained that In.A. was thirty-two weeks pregnant. I.A. was born on September 15, 2017. The trial court issued an instanter order placing I.A. into DCFS custody, and he and In.A. were placed at Lighthouse Ministries, a shelter for adolescent mothers and children. I.A. was adjudicated a Child in Need of Care (CINC) in January 2018.
>
> At Lighthouse, In.A. exhibited defiant behavior. In.A. did receive parenting instruction at Lighthouse, but those lessons seem to have not been absorbed. There surfaced other concerns as well, which led the facility to request that I.A. and In.A. be placed elsewhere. According to the testimony of In.A.'s case worker, Ms. Reneisha Stewart, I.A. was moved to a foster home on March 20, 2018, because of "incident reports that were happening between [I.A.] and [In.A.] and the home felt that it was a liability on them and they didn't want anything to happen to [I.A.]" In.A. was also moved to a different facility in Baker, Louisiana. Thereafter, In.A. saw I.A. every other week during supervised visits at either the DCFS facility in Lafayette or at a park near the Lafayette DCFS facility. I.A. was appointed a

---

[1] The initials of the children and their parents are used to protect the identity of the minor child. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

Court Appointed Special Advocate (CASA) volunteer, who also attended the bi-monthly visits.

In.A. was subject to a DCFS plan with the goal of reunifying her with I.A., but "her behavior problems as well as her not willing to listen to the instructors who were trying to help her parent her child" resulted in In.A. not progressing satisfactorily in this plan, according to Ms. Stewart. Her defiance, Ms. Stewart testified, had even progressed to physical aggression against the staff of the home. After nine months, DCFS sought approval to maintain I.A. in its custody but to change the goal of the plan from reunification to adoption. This plan was submitted on June 13, 2018.

A hearing on this change in I.A.'s plan was held on June 26, 2018. At the hearing, Ms. Stewart testified to the above facts. Her testimony indicated that In.A. had problems maintaining an orderly room. According to information Ms. Stewart received from her foster caretakers, In.A. resorts to destructive tantrums when not given her way. Ms. Stewart also testified to difficulties In.A. had in following the instructions of the foster caretakers regarding her own personal hygiene. In.A.'s rough play with I.A., that resulted in a minor "bump" on his head, was of deep concern for Ms. Stewart. Daycare workers also reported to Ms. Stewart that, following a family visit, I.A. presented with scratches on his abdomen.

The report of the CASA volunteer indicated, in pertinent part:

[In.A.] has shown herself to be incapable of properly caring for her baby for an ongoing time. Information gathered by CASA, from the DCFS case files, states that Dr Pappaspyrus, child psychiatrist, diagnosed [In.A.] (at age 8) with Oppositional Defiance Disorder. In February 2018, Dr Brennan, child psychologist, has expressed her concerns in regard to [In.A.]'s behavior toward [I.A.]. There have been reports from [In.A.]'s caregivers of her behaving in violent and aggressive ways. She has had trouble maintaining her own personal hygiene. According to reports, [In.A.] will never be capable of living on her own, caring for her child without a primary caregiver, or holding a job. She attends elementary school in a special education classroom. She is currently living at Provisions Residential Care in Baker, LA. In a conversation with staff members on [In.A.]'s progress, it was reported that [In.A.] struggles with hygiene, care of her belongings and proper interactive behavior. She does have some good days. [In.A.] is going to summer school to catch up on lessons, so that she will be ready for 7th grade. Ms[.] Keisha Roberson informed CASA that [In.A.] does have a long way to go with her progress and is very immature for her age, also saying that some things will never be possible for [In.A.] because of her low IQ.

2

CASA has observed and/or interacted in four different family visits (9.5). [In.A.] invariably shows brief and intermittent interest in [I.A.] and then moves on to her own interests. She demonstrates that she is not aware of [I.A.]'s needs and wants at any given moment and is only concerned with her own interests. She does not show any ability or even desire to care for him for more than a few moments at any given time. [In.A.] gives most of her attention to her mother, [V.A.], to her phone, and to photos or other belongings brought to visits. She often defers to another adult when someone indicates that [I.A.] is in need of some attention. When she does have him, she demonstrates lack of understanding of basic care for him. At one visit, she wanted to give [I.A.] a french fry "because he has three teeth". No family member objected, so CASA advised her that he was too young for this food and that it could cause him to choke. According to Reneisha, DCFS caseworker, she later 'snuck' the french fry to him anyway. When family visits are set at the park, CASA must interact when necessary, such as when [In.A.] or the 8-year-old half sister brings [I.A.] to a baby swing or when someone is trying to feed him things not meant for a baby. No family member has ever brought an age appropriate toy for [I.A.] to a visit.

The CASA volunteer recommended that DCFS change the goal for I.A. from reunification to adoption. The CASA volunteer, however, did not testify at the hearing.

At the close of testimony, In.A.'s attorney argued that DCFS had not made reasonable efforts at reunification. Specifically, he argued that In.A. had not been given parenting classes since I.A. was separated from her. He also argued that In.A. had not been given reasonable assistance to manage her trauma and improve her behavior. The trial court found that In.A. was "a twelve (12) year old child trying to be a mother, and that she does not possess the ability to be a mother, based on it's not going to change with parenting skills or anything else." The trial court noted the lamentable situation this posed but found that adoption was the appropriate disposition to correct it.

An order was entered by the trial court on June 25, 2018. The order did not contain language finding that DCFS's efforts at reunification were reasonable. It did state that the new plan was in I.A.'s best interests. In.A. then perfected this appeal.

A different panel of this court affirmed the judgment of the trial court maintaining I.A. in the custody of the State of Louisiana with the goal of placing I.A. for adoption. In so doing, the court concluded as follows:

3

In.A. was exploited by an adult whose inability to control his baser nature visited lifelong consequences on her. It was the sorry duty of the trial court to attempt to mitigate the harm to I.A.; the wellbeing of I.A. being the paramount consideration for the trial court in this proceeding. The law imposes a heavy burden on parents of any age. That In.A. experiences difficulty in meeting these standards is to be expected. I.A., though, can ill afford to wait for his mother to grow up. He needs stability and care now. The decision of the trial court is affirmed.

*Id.* at 886.

On February 10, 2020, the matter was taken up for a termination hearing as to only the minor mother, In.A, as the father of the child had previously stipulated to termination of his parental rights. After consideration of the evidence and testimony, the trial court granted the termination of parental rights as to the mother, continued the child in State custody, and declared the child eligible for adoption. The mother timely filed a Motion to Appeal the termination judgment. On appeal, In.A. asserts three assignments of error, as follows:

The juvenile court manifestly erred by finding clear and convincing evidence that the mother, In.A., did not substantially comply with her case plan and that [the] DCFS provided reasonable efforts to assist In.A. in completing her case plan.

The juvenile court manifestly erred by finding clear and convincing evidence that there was no reasonable expectation of the mother, In.A.'s significant improvement in the near future.

The juvenile court abused its discretion by failing to order the minor child be placed in a relative placement that could continue the bond of the minor mother, In.A., with her minor child, I.A.

## OPINION

In *State in the Interest of J.A.*, 17-500, pp. 3-4 (La.App. 3 Cir. 1/4/18), 237 So.3d 69, 72, this court stated with regard to the termination of parental rights:

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So.2d 719. This parental interest includes the "care, custody, and management of their child." *State ex rel. J.M.*, 02-2089, p. 7 (La.

4

1/28/03), 837 So.2d 1247, 1252. Consistent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. *Id.* Because termination of parental rights is a severe action, the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035; *State ex rel. B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "only one ground need be established." *State ex rel. B.H.*, 968 So.2d at 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

Further, in *State ex rel. J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806, 810-11 the supreme court provided the following:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M.*, 719 So.2d at 452; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all

5

legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d at 185.

A judgment terminating parental rights is reviewed on appeal under the manifest error standard of review. *State in the Interest of K.V.*, 14-163 (La.App. 3 Cir. 11/21/14), 161 So.3d 795.

In.A. first asserts that the juvenile court manifestly erred by finding clear and convincing evidence that she did not substantially comply with her case plan and that the DCFS provided reasonable efforts to assist her in completing her case plan. She further asserts in assignment of error two that the juvenile court manifestly erred by finding clear and convincing evidence that there was no reasonable expectation of In.A.'s significant improvement in the near future. We address these two assignments together.

The grounds relied upon by the State and the juvenile court for terminating the parental rights of In.A. in this case are set out in La.Ch.Code art. 1015(6).

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

At the termination hearing, the State presented the testimony of Lisa Nicotra, In.A.'s counselor, Brittany Johnson, her parenting educator, Zuntia Leger, her first caseworker, Reneisha Steward, her second case worker, and Quiana Gage, her

current case worker. After the State rested, the minor mother, In.A., presented the testimony of her aunt and foster placement, Shawnte Arceneaux.

Lisa Nicotra testified that she is a Behavioral Health Specialist for NIAlife Center for Counselling and that she had been working with the mother for approximately a year to assist her in her treatment plan. In.A. was twelve years old when she came to NIAlife and fourteen at the time of trial. In.A. had previously been diagnosed with anxiety disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder. Ms. Nicotra's role as a Behavioral Health Specialist was to work with In.A. on her treatment goals from her treatment plan, which included expressing feelings in a healthy manner, improving academic and behavioral performance at school, and understanding her diagnoses and alleviating symptoms. Ms. Nicotra stated that it is her job to "focus on [In.A.'s] well-being, not outside situations, and making sure that she's okay, and how to process her feelings and identify them" and that she is not involved with assisting with parenting skills for In.A. She stated with regard to In.A.'s progress and treatment for dealing with her disorders that she anticipates that the process could last anywhere from one to two years more from the date of trial. When asked on cross-examination if she thinks that "there is a reasonable expectation to believe [In.A.'s] going to continue improving with her behaviors as long as she's seeing you[,]" Ms. Nicotra replied "yes." She stated that based on her background and involvement she is not testifying as to any opinion regarding whether In.A. is fit to care for I.A.

Brittany Johnson then testified as the assistant director through Discovery Renew Family Resource Center who provided parenting training and counselling to In.A. beginning in July 2019. The parenting classes ended in December 2019, when In.A. was thirteen years old. She stated that while In.A. did develop nurturing skills during the course, she did not believe that In.A. was capable of independently caring

7

for I.A. and that most of her interactions with I.A. were akin to playing together as opposed to parenting. When asked if she thought that at some point in the future, when In.A. is an adult, if she might be capable of parenting, she responded, "Correct."

Zunita Leger, Foster Care Director for the DCFS testified next. She was the original case manager when I.A. entered into DCFS custody September 15, 2017. In.A. had already come into foster care services when she was pregnant with I.A, which is when Ms. Leger was assigned as her case manager. Ms. Leger established the first case plan, though testified that there was "little to no progress" from In.A. while she was the case manager. In.A. was initially placed in a home with I.A., but after being hospitalized, the foster placement no longer felt comfortable with In.A. staying in the home. The two then went to live at Lighthouse, a facility for teen mothers to learn parenting skills and schooling. Ms. Leger testified that In.A.'s current age and cognitive abilities did not allow her to understand certain safety issues concerning I.A.

Ryneisha Stewart testified that she has been the DCFS foster care case worker for I.A. since January 2018 and was also In.A.'s case manager until summer of 2019, having taken over for Ms. Leger. In.A. and I.A. stayed at Lighthouse until March of 2018, when In.A. was asked to leave by the staff at Lighthouse following a number of incidents and a refusal to cooperate with staff. I.A. was then placed with a family in Lafayette that he still resides with today that is an adoptive resource home. In.A. was placed in a group home in Baton Rouge. In September of 2018, In.A. was asked to leave this group home as well following defiance and behaviorial incidents and an unwillingness to cooperate or negotiate with staff. She was then placed in the home of a relative in Baton Rouge. During this time, Ms. Stewart testified to visits between In.A. and I.A, and noted that In.A. didn't appear aware of the age appropriateness of things with I.A. When asked if she has ever felt as if In.A. and

8

I.A. could be placed in a home together, Ms. Stewart testified no, stating that DCFS "always had, like, safety concerns for [I.A.]."

During her testimony, she summed up In.A.'s current difficulties in parenting I.A. as follows:

> [I.A.] is - - to [In.A.] [I.A.] is a toy and it's her possession, it's not like a parent wants her child. [In.A.] is a toy to - - I mean, [I.A.] is a toy to [In.A.]. So it's not more of, I want my child to parent my child, it's I want my child because that's my baby, that's my possession. It's not more of a parenting, it's more of, that's my child, I want it.

Quina Gage testified next. She was the case manager for In.A. from July of 2019 to December 2019. She reiterated problems that she encountered with In.A. during her involvement including In.A. being uncooperative with her aunt, whom she was placed in the physical custody of, and other defiant behavior. When asked if "at any point while you were the case manager did you feel like you were going to be able to reunite [In.A.] her child, [I.A.]" she replied "No." She further stated that she felt that the current placement with the prospective adoptive parents for I.A. provides him a wholesome and stable situation.

The court also considered the letter report of Dr. Brennan, a child psychiatrist who evaluated In.A. The report was introduced without objection from any of the parties. In her report, dated March 4, 2018, Dr. Brennan stated that she had the opportunity to evaluate In.A. on February 28, 2018 and administer the Wechsler Intellectual Scale for Children, Fifth Addition (WISC-V) assessment. The overall results of the assessment showed "significant intellectual limitations for [In.A.]" Dr. Brennan's personal observations of In.A. during the evaluation further "reflected her limited behavioral control." Dr. Brennan noted that during the evaluation her office manager personally observed In.A. exhibiting dangerous behavior towards I.A. Dr. Brennan summed up her assessment and opinion of In.A.'s ability to parent I.A. at the conclusion of her report.

9

[In.A.'s] intellectual abilities, particularly her verbal comprehension, and her poor judgement and impulse control, all make it clear that she does not have the ability to care for or protect a child. It does not appear to me that she has had sufficient structure or discipline to acquire the self-discipline to structure her own life, much less that of a dependent infant. She has not protected and does not know how to protect her child. She loves [I.A.] as a child loves a favorite baby doll. Unfortunately, that is not sufficient to provide [I.A.] with a chance for a healthy and successful life. [In.A.] deserved more, and her child needs and deserves an environment safer and more nurturing than she has had. Hopefully, [In.A] can also be placed in a safe and structured environment where she can learn the skills needed to protect herself and have a happier, more functional lifestyle.

Finally, In.A.'s aunt, with whom In.A. has been placed, testified. She stated that In.A. has lived with her for the last two years. She further stated that she works outside of the household in addition to taking care of In.A., and also takes care of In.A.'s younger brother, who is the same approximate age as I.A., although she receives no child support assistance for doing so and this adds additional stress on her. While she did testify that In.A.'s behavior and willingness to listen, to help around the house, and to go to school on time had improved, she still has days where she does not cooperate. In summary, she stated that In.A. has "[g]ood days and bad days." She replied affirmatively when asked by counsel for In.A. "if she gets to a place where she's able to care for Isaac, then it would be good for him to join her" … "if there was a place?" Notably, however, she did not indicate that she thought that In.A. was presently capable of parenting I.A.

At the conclusion of the hearing, the juvenile court provided oral reasons for terminating In.A.'s parental rights to I.A., stating

Okay. So, first, before I even address [In.A.] I have experienced many cases in the many years that I've been here doing this work, child welfare work. I'm not sure I have experienced a case where more traumatic events have been perpetrated upon an individual.

Having said that, I'm bound by law, I'm bound by finding clear and convincing evidence of noncompliance of a case plan or an ability to be able to parent a child. On the other hand, and probably on a higher hand, it's the ability to look for the child's best interest as well. [In.A.]

10

so you came and you I met two and a half years ago, I think. During that time, I did my best to try to address an issue which had happened to you that should never happen to anybody. I think you've grown as a young lady over the last few years, and your CASA, obviously, has spent a great deal of time in this case as well, and she also in her report tells me of the great progress you have made. Your aunt has said the same thing. From the days of those ladies coming from Deridder, or wherever it was, to talk about all the problems that happened with an eleven-year-old, twelve-year-old, mother to where you are today. And, yes, it's not all perfect and there's still some things, but I think you've grown, you've matured as those things that you can do. And I think, I would say right here, for your aunt having come into your life has been a huge, great thing for you and for your growth, and I'm, certainly, indebted to her, as I think you probably will when you understand that later on in your life. Some day I think you have the chance to be a mom. I really do. You're going to have to keep growing and keep learning and doing those things. But right now it's not the time, it's just not. At eleven years old, and twelve years old, and now at fourteen years old, there's many years ahead of you before you're going to be in a position to where you can parent a child.

I'm not going to read Dr. Brennan's letter, but when I first received Dr. Brennan's letter, it was clear to me that my job from that day forward in 2018, early '18, was to find a way to help you continue to grow, continue to do the things you need to do as a young person. And it was, clearly, for me, at that time, I knew it wasn't going to be for you to be a mom, not for [I.A.] at this time. Dr. Brennan's report and those things, clearly, indicate to me that there's a young lady, fourteen years old, who has a child, who I'm certain loves that child. I don't think there's a doubt in in my mind that you love that child with all your heart and all your ability, but for [I.A.] now the best interest for him and, clearly, based on the testimony and those things; you're unable to drive; you're unable to be employed; you're unable to house him; you're unable to do those things that adults can do. And it's not your fault, but it's just not there for you at this time.

So the Court finds at this time it's, clearly, in the best interest of the child to terminate parental rights at this time. And I'll sign a judgment on presentation.

We find no manifest error in the juvenile court's decision. This case presents the most tragic of circumstances for this mother, herself a minor child at the time of the conception and birth of her child, I.A. She was the victim of a horrendous crime; one no child should endure. She bears no responsibility for her past and present situation. However, this court is tasked here with the unenviable responsibility in the paramount to act in the best interest of I.A., as was the juvenile court.

It is clear from the testimony of the witnesses and other evidence before the court that there is no reasonable expectation of significant improvement in In.A.'s condition or conduct in the near future that would allow her to parent I.A. He is in his formative years developmentally and needs a safe, stable, and permanent home now, not years from now when In.A. nears or reaches adulthood and is able to drive, work to provide financially for a child, and potentially have the skills to nurture and raise a child. Given her age and circumstances, In.A. herself needs to be nurtured, parented, and supported, and thankfully has her aunt to attempt to do so. There is no manifest error in the decision of the trial court finding that she is unable to do those things now or in the immediate future, and therefore, the decision terminating In.A.'s parental rights and freeing I.A. for adoption is affirmed.

**AFFIRMED.**

12